COMMONWEALTH vs. RAMON GUERRERO
(and two companion cases[1]).

No. 90-P-889.

Plymouth. November 19, 1991. - March 23, 1992.

Present: KASS, SMITH, & GREENBERG, JJ.

*Controlled Substances. Joint Enterprise. Constitutional Law*, Admissions
   and confessions. *Evidence*, Admissions and confessions, Arrest record.
   *Practice, Criminal*, Instructions to jury.

Evidence at the trial of three defendants charged with trafficking in a
   quantity of cocaine exceeding twenty-eight grams was sufficient to war-
   rant a finding of joint control by the defendants over the cocaine found
   in the apartment where they were arrested. [265-266]
At a criminal trial, admission of testimony that a defendant had stated he
   was unemployed, in reply to questions asked him by police during rou-
   tine booking procedure, did not require reversal, where the defendant
   made no timely assertion that he had not been given renewed Miranda
   warnings before he was booked, and where he neither moved to strike
   the testimony objected to nor moved in limine to bar the prosecutor
   from mentioning employment status in closing argument. [266-269]
At a criminal trial, a judge's instruction to the jury to the effect that police
   had proceeded lawfully pursuant to a no-knock search warrant, was a
   proper correction of remarks in closing argument of defense counsel,
   characterizing the search and seizure as "Nazi justice." [269-270]

INDICTMENTS found and returned in the Superior Court
Department on March 7, 1988.

The cases were tried before *William H. Carey*, J.

*Yvonne P. Toyloy*, Committee for Public Counsel Services,
for Emilio Mejias.

*William M. Leonard* for Jose A. Sanchez.

*Robert C. Thompson*, Assistant District Attorney, for the
Commonwealth.

[1]The companion cases are against Emilio Mejias and Jose A. Sanchez.

*Thomas J. Freda*, for Ramon Guerrero, was present but did not argue.

KASS, J. One of the defendants, Emilio Mejias, raises the question whether, in the light of *Pennsylvania* v. *Muniz*, 496 U.S. 582 (1990), answers to questions about employment at booking may be admitted as inculpatory evidence. Each defendant urges that he was entitled to a required finding of not guilty. Jose A. Sanchez, another defendant, argues that the evidence placed against him before the grand jury was insufficient. We affirm the convictions of trafficking in more than twenty-eight grams of cocaine. G. L. c. 94C, § 32E(*b*).

Viewing the evidence in the light most favorable to the government, *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), the jury could have found the following. Two undercover State troopers, working a hunch, asked a man, referred to as E.T., where they might buy some cocaine. E.T. led the State troopers, Noone and Thomas, to the entrance of a first-floor apartment at 10 Union Street, Brockton. There, E.T. knocked on the door, spoke some words of Spanish, and passed money (supplied by one of the police officers) under the door. Within a minute, a small plastic "baggie" was passed back; its contents proved to be 28% pure cocaine.[2]

On the basis of the exchange he had witnessed, Trooper Noone applied for and received a "no knock" search warrant for the first-floor apartment. That night, February 16, 1988, around 9 P.M., a squad of police officers descended upon 10 Union Street to execute the warrant. Two officers, O'Reilly and Luciano, undertook to make an additional "buy" before the search team moved in. They noticed, however, that their approach had been observed; Trooper O'Reilly saw someone looking at them from an apartment window as they drove up and then quickly close the curtain.

---

[2]E.T. apportioned the contents of the baggie, half to himself and half to the patrons who had provided the money to buy it.

Armed with a one-person battering ram,[3] O'Reilly opted for an immediate entry. From the hallway, he heard the sound of running footsteps inside the apartment. O'Reilly broke down the door with his battering ram and, with Luciano behind him, raced for the bathroom. There he found the three defendants between the bathtub and the toilet. The officers maneuvered the defendants into the bathtub, a place where, according to O'Reilly, they could be "secured." Other officers then escorted the defendants elsewhere in the apartment, leaving O'Reilly and Luciano to begin their search in the bathroom. The toilet attracted attention because it was at a tilt and without water in it. With the aid of a flashlight, O'Reilly inspected the crack between the tilted toilet and the floor. He saw a plastic baggie. To get at it, O'Reilly "dismantled" the toilet with his battering ram. That baggie enclosed twelve smaller bags containing white powder which proved to be cocaine.

Trooper O'Reilly then went down to the cellar to examine the soil pipe that led from the toilet. There was a further dismantling by battering ram. So disassembled, the soil pipe disgorged sixteen small plastic bags of cocaine. All the small bags were "very similar if not identical" to the baggie E.T. had bought earlier in the day.

Other matter of interest found by the police in that apartment included: a bucket of water in the bathtub, a triple beam scale, three machetes, a wooden club, and $450 in cash. The entry doors to the apartment were secured from within by two-by-fours held in place by metal brackets on each side of the door frame. A search of the defendants turned up $314 in cash on the person of Mejias and $290 on that of Guerrero. The defendants denied living in the apartment.

1. *Required finding of not guilty.* This aspect of the appeal is controlled by our opinion in *Commonwealth* v. *Arias*, 29 Mass. App. Ct. 613, 617-620 (1990), *S.C.*, 410 Mass. 1005

---

[3]O'Reilly described this device as "approximately a foot and a half, two feet long and weighs approximately forty to fifty pounds and it's made specifically to take down doors."

(1991). As in *Arias*, the defendants argue that the government proved only their presence where drugs were found. The Commonwealth had also adduced evidence, however, that there was active running around when the approach of the police was apparently spotted. All three defendants chose to hustle to a semifunctioning bathroom, where drugs were found to have been secreted. Both entry doors were barricaded with two-by-fours resting in metal brackets. Although sparsely furnished, among the equipage were a club, three machetes, and a triple-beam balance scale. A sandwich bag containing $450 was hidden between a wooden board and a table bottom. Then there was the cash found on Mejias ($314) and Guerrero ($290). The drugs found on the premises were packaged in the same manner and diluted with the same dilutant (lactose) to practically the same proportion as the cocaine sold earlier in the day to E.T. This web of circumstantial evidence was strong enough to warrant a finding of joint control and power by the defendants over the cocaine found in the apartment. *Commonwealth* v. *James*, 30 Mass. App. Ct. 490, 494-500 (1991).

In abbreviated form, Trooper O'Reilly provided the same evidence to a grand jury. If the evidence was enough to convict, it was more than enough to secure an indictment. The motion in behalf of Sanchez (on whose person no cash was found) to dismiss the indictment was properly denied. See *Commonwealth* v. *Arias*, 29 Mass. App. Ct. at 616-617.

2. *Admissibility of statements made during booking.* At their booking, the defendants were asked about their employment, and each stated he was unemployed. In closing, the prosecutor invited the jury to reflect on the significance of the cash found on the premises coupled with the declarations of the defendants that they were unemployed. Manifestly, the statements of the defendants about their employment status were inculpatory. The circumstances of the defendants' unemployment came in evidence, over defense objections, through the testimony of Trooper Luciano, who had been the booking officer.

In *Commonwealth* v. *Kacavich*, 28 Mass. App. Ct. 941 (1990), we summarized the State and Federal authorities which held that routine questions put at booking, including inquiries about address and employment, were not interrogation within the meaning of the Miranda rule because the purpose of such questions was not investigatory. Such questions might, therefore, be asked without Miranda warnings. Subsequent to the *Kacavich* opinion, the Supreme Court, in *Pennsylvania* v. *Muniz*, 496 U.S. at 601, further defined the "routine booking exception" to the Miranda principle as "biographical data necessary to complete booking or pretrial services." As examples of permissible routine booking questions, the Court cited questions regarding the name, address, height, weight, eye color, date of birth, and current age[4] of the defendant. Categorized as impermissible was a question asked of Muniz to test his sobriety, "Do you know what the date was of your sixth birthday?" In the face of an inaudible reply, the police officer tried again, "When you turned six years old, do you remember what the date was?" Although the police were not interested in the date of Muniz's sixth birthday, but in his ability to calculate it, the Court reasoned that if the content of the answer to a question had potential to incriminate, then the question was one which a person in custody ought not to be asked without Miranda warnings. *Id.* at 596-599. The content of Muniz's truthful answer to the question put, that he did not know the date of his sixth birthday, supported an inference, incriminating in his case, that his mental faculties were impaired. *Id.* at 599.

Similarly, while a booking officer proceeding down a litany of routine questions may have no investigatory purpose in asking the arrested person about how she or he is employed, the content of what comes from the lips of that person in response to the question may be incriminating, as the instant case illustrates. Predictably, the prosecutor thought the juxtaposition of cash and lack of employment worth mentioning in closing argument. To be sure, even the most basic bio-

---

[4]Current age may, of course, be deduced from date of birth, but the Pennsylvania police asked for both.

graphical questions — name, age, address, next of kin, weight, height, eye color — may in a particular context yield information which assists in proving the case against the defendant. That sort of information is pertinent, however, to the custodial responsibilities of the police. The relevance of occupation and employment to those responsibilities is less immediately obvious, and, in light of the *Muniz* decision, it will be preferable, unless Miranda warnings are repeated prior to booking, to scrub questions about employment status from the booking ritual. See Smith, Criminal Practice and Procedure § 341 n.2.5 (Supp. 1991). Cf. *United States* v. *Doe*, 878 F.2d 1546, 1551-1552 (1st Cir. 1989).

Our reflections on the bearing of the *Muniz* case on booking practices do not, however, carry the day for Mejias, the only one of the defendants who has raised the point. Mejias did not assert below that he did not receive a renewal of the Miranda warnings before he was booked, nor did he move at trial (1) to strike his answer at booking to the employment status question or (2) by a motion in limine, to bar the Commonwealth from mentioning the employment status of the defendants in closing argument.

That Mejias made no pretrial motion to suppress his booking statement should, perhaps, occasion no surprise. There is some doubt that the government ever made the booking statements available to defense counsel before trial. Indeed, Mejias claims on appeal that his statement about being unemployed should have been suppressed on the authority of *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), i.e., that the government had failed to comply with a pretrial agreement to disclose inculpatory (or exculpatory) statements. See also *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 20-21 (1987). All three defense lawyers insisted they had not received the booking sheets. The assistant district attorney, for his part, insisted the booking sheets had been furnished. The judge made no findings which resolved the conflict, nor was he pressed so to do by defense counsel.[5] On that state of the

[5]One may add that booking sheets are available for inspection by defense counsel and that it is difficult to take seriously the posture of outrage

record, the foundation for a motion to suppress was inadequate.

Astutely, the judge declared a recess during which the defense lawyers might consider how to cope with adverse material in the booking sheets. Neither counsel for Mejias nor for the other two defendants moved to strike or suppress their clients' statements on the ground that they had been made without adequate refreshment of Miranda warnings. Indeed, Detective Luciano had testified that these Spanish-speaking defendants were given Miranda warnings orally by him. He also testified that there was a sign in Spanish in the booking room which announced the Miranda rights. At trial, Mejias did not argue that his statement about employment was unguarded because he had not received timely or adequate Miranda warnings. He cannot now attempt to argue on appeal an issue that rests on the assumption that he had not received adequate Miranda warnings when he was booked. Finally, the failure of counsel for Mejias to request a continuance after disclosure of Mejias's inculpatory statement suggests that earlier knowledge of it would not have resulted in effective defense tactics to neutralize such adverse impact as the statement had. See *Commonwealth* v. *Medina*, 372 Mass. 772, 779-780 (1977); *Commonwealth* v. *Baldwin*, 385 Mass. 165, 177 (1982).

3. *The objection to the instruction.* During his closing argument, counsel for Sanchez, Mr. William M. Leonard, characterized the search and seizure operation in this case as "Nazi justice." It was altogether appropriate — hence not error — for the trial judge to comment as follows:

> "In addition, members of the jury, despite what might be any arguments or comments made to you to the contrary, the police, in this case, in the execution of this warrant acted properly in accordance with our American law. It was a no knock warrant, it was legally obtained, the search was legal in accordance with the

assumed by the defense lawyers that they had been unfairly surprised by mention of what appeared on those sheets.

warrant, the gathering of the material under the authority of the warrant was legal and the return to the Court was legal. No inference should be drawn to the contrary.

"Also, members of the jury, the fact that I am making this comment to you with respect to the lawyer's argument should not, in any way, be considered adverse to the defendants, but I make it for your purposes to set the record straight. What happened after the warrant was executed, and with respect to the elements of the crime is going to be completely up to you. But the procedure was perfectly authorized and legal."

The judge's comment was a necessary correction of Mr. Leonard's excessive remarks. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 693 (1983) (condemning closing argument [in that case by prosecutor] calculated to distract jurors from detached consideration of the evidence); *Commonwealth* v. *Edgerly*, 6 Mass. App. Ct. 241, 257 (1978) ("[i]t is the duty of the trial judge to guard against improper argument to the jury"). See also *Commonwealth* v. *Hogan*, 12 Mass. App. Ct. 646, 653 n.10 (1981).

*Judgments affirmed.*