661 So.2d 842 (1995)
STATE of Florida, Appellant,
v.
William E. BURNS, Appellee.
No. 94-457.
District Court of Appeal of Florida, Fifth District.
August 25, 1995.
*843 Robert A. Butterworth, Attorney General, Tallahassee, and Kristen L. Davenport, Assistant Attorney General, Daytona Beach, for Appellant.
Herbert H. Hall, Jr., Winter Garden, for Appellee.

ON MOTION FOR REHEARING
GOSHORN, Judge.
We deny Burns's motion for rehearing. We withdraw our opinion issued March 31, 1995 and substitute the following opinion.
The State appeals from a suppression order entered by the county court. This court accepted jurisdiction pursuant to Florida Rule of Appellate Procedure 9.160(e)(2) as a matter certified to be of great public importance because individual Orange County judges were issuing conflicting rulings on the issues presented.

THE FACTS
Deputy Roberta Almadova, seeing William E. Burns's vehicle make a wide turn and weave, turned on her overhead red and blue lights and pulled Burns's vehicle over. She intended to ticket him for failure to maintain a single lane. She asked him to please exit his vehicle and to keep his hands out of his pockets. Burns had a strong odor of alcohol on his breath, red, bloodshot eyes and slurred speech. Burns asked several times to be allowed to go because he was only just around the corner from his house. The deputy refused his requests and initiated field sobriety tests. At the time the deputy started the field sobriety tests, the deputy believed she had probable cause to arrest Burns for DUI. She did not read Burns his Miranda rights before beginning the tests.
Burns was asked (1) to recite the alphabet non-rhythmically while standing with his feet together, hands at his side and head back, (2) to stand on one leg and count, (3) to walk heel to toe nine steps and (4) to put his finger to his nose. Burns was unable to perform the first three tests and refused to take the finger to nose test. Burns was arrested for DUI eleven minutes after he was stopped.
Deputy Almadova drove Burns to the South Orange Blossom Trail testing center, which has small rooms for videotaping and breath testing. Burns refused to repeat the field sobriety tests on camera and refused the breath test. After Burns's refusals, the deputy read Burns his Miranda rights off a form. Burns signed the form and invoked his rights.
Burns moved to suppress his statements, the field sobriety tests and the fact of his refusals to submit to testing. Burns testified at the suppression hearing that he stopped in response to the flashing lights and believed that he had no choice but to stop. At the testing center, Burns refused to repeat the tests while being videotaped because he knew he had not done the tests properly and did not want to repeat them. He was distracted by having to do more than one thing at a time, i.e., count while standing on one leg. Burns was videotaped while answering questions regarding his name, age, address, and date of birth, which information had already been given to the deputy. He believed he was asked these questions again in an effort to "trip him up." The officers did not make notes of what he said. Burns further testified that had he been read his rights at the scene of the stop, he would have *844 asked for an attorney then. He never did ask for an attorney.
The county court suppressed statements by Burns at the roadside, including his recitation of the alphabet and counting, the videotape taken at the testing center and evidence of Burns's refusal to perform all tests. The State appeals. We affirm in part and reverse in part for the reasons hereinafter set forth.

ROADSIDE TESTS
The trial court found Burns was in custody at the point he was asked to exit his vehicle and provide his license and registration to the deputy and that accordingly, Burns should have been advised of his Miranda rights prior to being asked to perform the field sobriety tests. Because Burns had not been Mirandized, the court suppressed Burns's roadside statements made in response to the deputy's instructions, including Burns's recitation of the ABC's and his counting.
In resolving this issue, we first must determine if Burns was legally in custody at the roadside because Miranda warnings are required only when a defendant is subjected to custodial interrogation.[1]See Roberts v. United States, 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980); Arbelaez v. State, 626 So.2d 169 (Fla. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994); Traylor v. State, 596 So.2d 957 (Fla. 1992).
The facts found by the trial court show nothing more than a routine traffic stop. Burns was stopped and was asked for his license and registration and to perform field sobriety tests. The stop was short (eleven minutes), occurred in a public area, only one officer was present, and the tests were simple. These factors are identical to those cited by the Court in Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) in holding that "treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest." The Court determined that generally the roadside questioning of a motorist pursuant to a routine traffic stop does not constitute custodial interrogation, but did not adopt a per se rule in this regard. Instead, the Court left to the trial courts the determination whether a detained motorist "thereafter is subjected to treatment that renders him `in custody' ..." entitling him to the protections afforded by Miranda. 468 U.S. at 440, 104 S.Ct. at 3150.[2]See also Pennsylvania v. Bruder, 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988) (holding that where defendant was subjected to an ordinary traffic stop, asked a "modest" number of questions, and requested to perform a simple balancing test, defendant was not in custody for purposes of Miranda).
Here, there are no factors which would take this case outside the holding in Berkemer. The trial court's finding that Burns reasonably believed his freedom of action was "curtailed to a degree associated with actual arrest" was erroneous as a matter of law. While his freedom of action was curtailed, as it is in any detention, Burns did not bring forth any evidence that he was subjected to any restraints comparable to those found in a formal arrest. See Traylor. Additionally, Burns's testimony to the effect that prior to the roadside tests, he requested to be allowed to go because he was just around the corner from his residence is not determinative. The deputy could properly have refused the request regardless of whether Burns was subject to a full custodial arrest or a temporary detention.
*845 Burns, citing Traylor v. State, 596 So.2d 957 (Fla. 1992), argues that the federal custody cases are inapplicable because Florida has expanded the definition of custody under the Florida Constitution. Traylor does contain a lengthy discourse on federalism and the ability of states to more strictly restrain state action than is imposed under the Federal Constitution. However, what Traylor also does is to define custody under the Florida Constitution almost identically to the federal definition. The Traylor court stated:
A person is in custody for Section 9 [of the Florida Constitution] purposes if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest.
Id. at 966. Berkemer defines custody as occurring "as soon as a suspect's freedom of action is curtailed to a `degree associated with formal arrest.'" 468 U.S. at 440, 104 S.Ct. at 3150 (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983)). Accordingly, we find that Florida has not chosen to restrain governmental intrusion in this area more vigorously than does the Federal Constitution and that Fifth Amendment precedent is applicable.
Because Burns was not in custody at the time of his roadside tests, Miranda warnings were not required prior to Burns's roadside testing. Accordingly, any and all of Burns's roadside statements, including his recitation of the alphabet and counting, are admissible.

THE BOOKING PROCEDURE
After Burns was arrested at the scene, he was taken to the DUI testing center on South Orange Blossom Trail. While being videotaped but before receiving his Miranda warnings, Burns again answered questions regarding his name, age, address, and date of birth.[3] These questions are basic biographical questions which have been held not designed to elicit an incriminating response. See Allred v. State, 622 So.2d 984 (Fla. 1993) (finding that routine booking questions do not require Miranda warnings because they are not designed to lead to an incriminating response; rather, they are designed to lead to essential biographical data). In State v. Foster, 562 So.2d 808, 809 (Fla. 5th DCA 1990) this court recognized that "[u]nless there are unusual circumstances, ... the routine gathering of biographical data for booking purposes cannot be characterized as an inherently coercive custodial interrogation. The questions posed do not relate to criminal activity, and they are not posed to elicit an incriminating response." The type of "unusual circumstance" which would trigger the need for Miranda warnings prior to asking these routine questions is where the answer to a seemingly routine question would incriminate the suspect, for example, where a suspect is asked his nationality and then is charged with possession of a firearm by an alien. See United States v. Mata-Abundiz, 717 F.2d 1277 (9th Cir.1983); see also Commonwealth v. Guerrero, 32 Mass. App. Ct. 263, 588 N.E.2d 716 (1992) (holding that defendant should have been Mirandized prior to the booking officer asking his employment status where the content of defendant's answer was used as incriminating evidence at trial).
In the case at bar, the trial court apparently concluded that the deputies were repeating the biographical questions already asked and answered in order to elicit an incriminating response from Burns. However, the officers' focus was not on the content of Burns's answers, but rather was a legitimate effort to memorialize Burns's manner of speech. The officers undoubtedly wanted as much videotape as possible of Burns's physical attempts to speak. The content of most, if not all, of the answers to these routine questions was, it appears from this record, immaterial.[4] The suppression of *846 Burns's answers is required only to the extent that Burns's answers were incriminating.
The determination of whether a defendant's response is incriminating, and hence subject to suppression in the absence of Miranda warnings, turns on whether the custodial questioning constituted an interrogation.[5] In Allred,[6] the defendant was asked, after his arrest but before being advised of his Miranda rights, to
recite the alphabet from "c" to "w" at the roadside, in the presence of three police officers; Allred instead recited from "e" to "w." Allred was asked to count from 1001 to 1030 at the police department after his arrest, as part of the one-legged stand test of sobriety. Allred counted from 1001 to 1021 correctly, but thereafter dropped the prefix 1000 before each number.
Richard DiAndrea, II, (DiAndrea) was stopped for a driving infraction and suspected DUI. He was asked by the police officer at the roadside to recite the alphabet; he could not get past "p." After his arrest, he was asked at a videotaping facility to recite the alphabet from "c" to "w" during the one-legged stand test; he instead recited it from "c" to "z." DiAndrea also was asked to count from 1001 to 1030, which he did successfully.
Id. at 985 (footnote omitted). The court held that both defendants had been interrogated.
It is undisputed that petitioners here were in custody; they were under arrest. We find that petitioners were being interrogated within the meaning of Traylor when they were asked to recite, out of the ordinary sequence, the alphabet and numbers. A reasonable person would conclude that the request to recite, out of the ordinary sequence, letters and numbers was designed to lead to an incriminating response. We find moreover that the petitioners were denied their Florida constitutional protection against self-incrimination. Failure to accurately recite the alphabet "discloses information" beyond possible slurred speech; it is the content (incorrect recitation) of the speech that is being introduced, rather than merely the manner (slurring) of speech.
* * * * * *
If the recitation of the alphabet were admitted only to show slurred speech, we would agree that only physical evidence is involved. We cannot agree that the information disclosed in the instant cases however is mere physical information. The content is incriminating evidence out of the suspect's own mouth. The incriminating inference is drawn from the testimonial act  answering the question incorrectly, not from physical evidence  slurred speech.
Id. at 987 (emphasis added). In so holding, the supreme court disapproved Contino v. State, 599 So.2d 728 (Fla. 2d DCA 1992) (holding admissible the fact that defendant was unable to recite the alphabet past the letter "p," where it appeared the defendant had been asked to recite the entire alphabet).
Allred did not hold that asking a defendant to recite the alphabet or to count always constitutes an interrogation such as violates a defendant's privilege against self-incrimination. In fact, the court's opinion indicates that only where the defendant's response is incorrect does the content of the speech become incriminating. If a defendant were to correctly recite the full alphabet, yet do so with slurred speech, his performance would be admissible for its physical evidentiary value, i.e., to show the manner in which defendant performed. See Pennsylvania v. Muniz, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (requiring a suspect to demonstrate the physical way in which he articulates *847 words is not a request for a testimonial, potentially incriminating response). In short, under Allred, an officer may testify that a defendant in custody slurred his speech when he performed the requested recitations, but the fact that he performed poorly, e.g., could not complete the alphabet, could not be brought out unless defendant had been Mirandized. If the State wants to be able to introduce evidence demonstrating a defendant's poor level of performance (as opposed to manner of performance), the State must first give a defendant Miranda warnings. The failure to so warn a defendant does not, however, result in the suppression of evidence of a defendant's manner of performance. In the instant case, to the extent Burns answered the questions correctly, the tape of Burns's answers is not incriminating and should have been held admissible to show his manner of speech.

RIGHT TO COUNSEL
Under the Florida Constitution, the right to counsel attaches "at the earliest of the following points: when he or she is formally charged with a crime via the filing of an indictment or information, or as soon as feasible after custodial restraint, or at first appearance." Traylor, 596 So.2d at 970 (footnotes omitted). The court noted in Traylor that "[a]s a general rule, assignment of counsel is feasible by the time of booking. See Fla.R.Crim.P. 3.111(c)."[7]Id. at 970, n. 38. The Sixth Amendment right likewise attaches at the earliest of the following points: "formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). The right to counsel under the two constitutions does not necessarily attach simultaneously, but "[r]egardless of when the right attaches, the defendant must still invoke the right in order to be protected." Phillips v. State, 612 So.2d 557, 558 n. 2 (Fla. 1992). Here, however, defendant was neither advised of his right to counsel nor was he given the opportunity to try to hire one. His failure to invoke his right cannot be held against him where the State failed to inform him of his right.
Defendant argues strenuously that he had the right to counsel at the testing center because it would have been feasible to provide counsel at that point. He was at a facility that had telephones, which he could have used to phone counsel. If he had not been able to reach an attorney, then that factor would support a finding that it was not feasible.
The State answers that it is not feasible to provide counsel prior to testing because of the nature of the offense. Evidence must be captured before it disappears, and with each passing minute, key evidence is being lost. The testing center was, the State points out, "specifically designed to allow efficient, timely testing and recording of a DUI suspect's physical qualities." Immediately upon completion of the testing, a defendant is read his Miranda rights. The State also argues that the purpose of the Section 16 right to counsel, to allow a defendant to effectively defend himself against criminal charges, is not violated by the short delay in allowing him to contact an attorney. An attorney can readily attack the videotaped performance in the "usual" ways.
Whether the right to counsel was provided "as soon as feasible" is a nebulous gray area, the determination of which is completely dependent on how much importance is given the State's dilemma. Even stationing a public defender at the testing center would not solve the problem because there has been no judicial determination of a defendant's right to a public defender at this stage of the proceedings. Certainly if "feasible" means possible, then the right to counsel attached immediately at the center. We conclude that we need not answer that question because the asking of the biographical questions and the gathering of physical data is not the type of "crucial confrontation or stage" which necessitates the presence of counsel. The Traylor court discussed "crucial stage" as follows:

*848 [W]e hold that a prime right embodied by the Section 16 Counsel Clause is the right to choose one's manner of representation against criminal charges. In order for this right to have meaning, it must apply at least at each crucial stage of the prosecution. For purposes here, a "crucial stage" is any stage that may significantly affect the outcome of the proceedings. Because a prime interest that is protected is the right of the individual to exercise self-determination in the face of criminal charges, prosecution begins under the Counsel Clause when an accused is charged with a criminal act, as set out below.
Once the defendant is charged  and the Section 16 rights attach  the defendant is entitled to decide at each crucial stage of the proceedings whether he or she requires the assistance of counsel.
* * * * * *
Once the right to counsel has attached and a lawyer has been requested or retained, the State may not initiate any crucial confrontation with the defendant on that charge in the absence of counsel throughout the period of prosecution, although the defendant is free to initiate a confrontation with police at any time on any subject in the absence of counsel.
Traylor, 596 So.2d at 968 (footnotes omitted).
The right is designed to allow the accused to effectively defend himself against the charges. The defendant's right is not impacted by administering the tests outside the presence of counsel. The defendant can defend himself, without handicap, as he has always done. Defense counsel can attack the field tests and the breathalyzer tests through discovery, cross examination, and defense experts. We do not agree with the analogy Burns attempts to make between the DUI evidence gathering process and the staging of a line-up, a circumstance where the procedure "is riddled with the danger of unreliable identification and cannot be effectively questioned at trial without counsel's presence to note problems." See United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967). The Supreme Court in Wade distinguished line-ups from physical testing such as the taking of blood samples. Blood alcohol tests and breathalyzer tests are the types of scientific tests which can be adequately challenged through cross-examination, as was pointed out in Wade with regard to blood sampling.
We hold that administering a breathalyzer and having a defendant perform the field sobriety test on videotape are really nothing more than the collection and preservation of physical evidence, as is done in every type of case, and do not constitute a crucial confrontation requiring the presence of defense counsel.

REFUSAL TO SUBMIT TO TESTS
Burns was asked to perform the field sobriety tests again on the videotape. Burns refused to repeat the tests and refused to take a breath test. The deputy then read Burns his Miranda rights off a form. Burns signed the form and invoked his rights. The trial court excluded evidence of his refusal.
We find that Burns's refusal to submit to the breathalyzer test is clearly admissible. See Section 316.1932, Fla. Stat. (1992) (refusal to submit to breath test is admissible in evidence in any criminal proceeding); Edwards v. State, 603 So.2d 89 (Fla. 5th DCA 1992) (holding that the statute's requirement that the refusal to take the test be received in evidence does not violate any constitutional privileges); State v. Sowers, 442 So.2d 239 (Fla. 5th DCA 1983) (holding that a suspected drunk driver's refusal to submit to a blood alcohol test can be used as evidence in a criminal case and its admission does not violate either the Florida Constitution or the United States Constitution).
We also find that Burns's refusal to perform physical, non-testimonial field sobriety tests, e.g., finger-to-nose, heel-to-toe, etc., on videotape at the testing center is admissible. In Occhicone v. State, 570 So.2d 902 (Fla. 1990), cert. denied, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991), evidence that the defendant had refused to allow his hands to be swabbed for an atomic absorption test was introduced by the State to refute the defendant's claim that his intoxication prevented him from knowing what he was doing. *849 On appeal, defendant argued that allowing the State to comment on his refusal to take the hand swab test penalized him for exercising his Miranda rights. The court disagreed, finding that the comment on the evidence was made only to refute defendant's claim of diminished capacity, not to demonstrate his guilt and further noted that there was no timely objection. In a special concurrence, Justice Grimes wrote that the refusal to take the test was not protected by the constitutional privilege against self-incrimination:
Just as he could have been required to submit to fingerprinting, photographing, or blood tests, ... Occhicone could have been compelled to undergo the hand-swab test. Having refused to taking the test, evidence of this fact was admissible for any relevant purpose. Thus, W. LaFave & J. Israel, Criminal Procedure § 7.2(c) (1985), states:
What happens if a defendant refuses to cooperate in an identification procedure which requires his active participation? One possibility is that the prosecutor may be permitted to comment on the refusal to cooperate. If the identification procedure in which the defendant has refused to participate or cooperate, such as a lineup or taking of exemplars, is not protected by the Fifth Amendment, then of course there is no right to refuse and thus the act of refusal is not itself a compelled communication. Rather, that refusal is considered circumstantial evidence of consciousness of guilt just as is escape from custody, a false alibi, or flight.
(Footnote omitted).
Occhicone, 570 So.2d at 907 (citation omitted). The First District in Wilson v. State, 596 So.2d 775 (Fla. 1st DCA 1992), adopted the concurrence in Occhicone and held that evidence of defendant's refusal to submit handwriting exemplars pursuant to court order was admissible. The instant case involves a post arrest refusal to perform which, pursuant to the reasoning of Wilson and Justice Grimes in his concurrence to Occhicone, is admissible as to the physical, non-testimonial aspects of the tests.
The supreme court in Traylor has now held that in a pre-arrest situation, a defendant's refusal to take a field sobriety test (not involving a testimonial response) is admissible as relevant to show consciousness of guilt. We find nothing in Traylor which requires a different result in a post-arrest circumstance. Thus, to the extent that Burns refused to comply with a request to take physical, non-testimonial tests, we hold that the refusal is admissible. Cf. Allred.
In summary, we hold that Burns's statements and physical performance at the roadside are admissible. The videotape of Burns taken at the testing center is admissible only to the extent that his responses were not incriminating, i.e., to the extent he answered the questions correctly, Burns's answers are admissible to show the manner in which he performed. Burns was not entitled to counsel at the center prior to the testing. His refusal to perform the physical, non-testimonial field sobriety tests on videotape at the center and his refusal to submit to the breathalyzer test are also admissible.
REVERSED in part; AFFIRMED in part; and REMANDED.
COBB and W. SHARP, JJ., concur.
NOTES
[1] The Florida Supreme Court recently addressed the propriety of roadside tests under a similar factual scenario in State v. Taylor, 648 So.2d 701 (Fla. 1995) and held: "The officer was entitled under section 901.151 to conduct a reasonable inquiry to confirm or deny that probable cause existed to make an arrest. [The officer's] request that Taylor perform field sobriety tests was reasonable under the circumstances and did not violate any Fourth Amendment rights."
[2] The Court acknowledged, "Admittedly, our adherence to the doctrine just recounted will mean that the police and lower courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody." 468 U.S. at 441, 104 S.Ct. at 3151.
[3] Burns had already provided this information to the deputy prior to the videotape, and there was no indication the deputies were going to use the information for a report.
[4] Answers to these routine biographical questions, at least to the extent the questions do not call for an answer which requires a suspect to perform a mental calculation and to the extent the suspect answers correctly, are admissible. It should be noted, however, that if a suspect is so inebriated as to be unable to recall his or her own name, for example, that inability would be incriminating. The content of the response "I can't remember" to such an elementary question supports an inference of impaired mental faculties. See Pennsylvania v. Muniz, 496 U.S. 582, 599, 110 S.Ct. 2638, 2649, 110 L.Ed.2d 528 (1990).
[5] Traylor defines "interrogation":

Interrogation takes place for Section 9 purposes when a person is subjected to express questions, or other words or actions, by a state agent, that a reasonable person would conclude are designed to lead to an incriminating response.
596 So.2d at 966, n. 17.
[6] Consolidated with Allred was Diandrea v. State.
[7] Rule 3.111(c) makes it the duty of the booking officer to immediately advise the defendant of his right to counsel.