DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE OF FLORIDA,**
Appellant,

v.

**DANIEL BLOCKER,**
Appellee.

No. 4D22-1113

[April 26, 2023]

Appeal from the County Court for the Seventeenth Judicial Circuit, Broward County; Kenneth A. Gottlieb, Judge; L.T. Case No. 20-11038MU10A.

Ashley Moody, Attorney General, Tallahassee, and Jessenia J. Concepcion, Assistant Attorney General, West Palm Beach, for appellant.

Gordon Weekes, Public Defender, and Lisa S. Lawlor, Chief Assistant Public Defender, Fort Lauderdale, for appellee.

GROSS, J.

The State appeals the trial court's order granting appellee Daniel Blocker's ("the defendant") motion to suppress statements made after a motor vehicle accident. We reverse because there was no custodial arrest triggering the full panoply of *Miranda*[1] protections and the accident report privilege did not apply to the defendant's statements.

The defendant moved to suppress statements he made to the police during a post-crash interaction with the police. He argued that his statements were protected by the accident report privilege or were obtained in violation of his right to counsel and his privilege against self-incrimination.

The trial court held a hearing on the defendant's motion.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

### *The Evidence at the Suppression Hearing*

The defendant was involved in an accident with a deputy's patrol car.

Deputies at the scene conducted a crash investigation. Nothing in this record indicates that the crash investigation deputies told the defendant that he *had* to respond to the questions asked by the officers. The defendant provided his driver's license, registration, and insurance card to one of the deputies.

Deputy Sapp of the DUI task force was later called to the scene to investigate a suspected impaired driver. When he arrived at the scene, he spoke with the officers already there. He recorded his interaction with the defendant on a bodycam video, which was introduced into evidence.

After speaking with the other deputies, Deputy Sapp called to the defendant and asked, "Can I talk to you please?" The defendant replied, "Yes, sir" and walked over to the deputy, who pointed to his truck across the street and asked if the two of them could "walk to the front of [it], please?" Deputy Sapp wanted the defendant to perform field sobriety exercises on a flat, paved area.

The defendant complied with Deputy Sapp's request.

After they moved across the street, Deputy Sapp obtained the defendant's name, date of birth, phone number and address.

Deputy Sapp then introduced himself to the defendant and said that he was there to conduct a criminal DUI investigation "because the deputies that have been interacting [with the defendant] expressed some concern about [his] ability to operate a motor vehicle safely." Deputy Sapp asked the defendant if he would answer some questions and perform some field sobriety exercises. The defendant agreed to participate.

Deputy Sapp did not read the defendant his *Miranda* warnings.

Deputy Sapp asked the defendant questions pertaining to his medical background, the last time that he slept, whether he had anything to eat or drink, where he was coming from, where he was going to, and if he had taken any drugs.

The defendant did not want to answer questions about the last time he slept without his lawyer being present. He indicated that he felt Deputy Sapp was "interrogating" him. Deputy Sapp advised the defendant

multiple times during their interaction that he did not have to answer his questions.

Several times, the defendant asked about the investigation of the accident and Deputy Sapp redirected the conversation by explaining that the accident investigation was "a totally different thing" which other officers were handling. Deputy Sapp never tried to elicit facts from the defendant about the accident.

After asking these questions, Deputy Sapp moved on to conduct the field sobriety exercises. During his interaction with the defendant, Deputy Sapp noticed signs of impairment, such as an odor of an alcoholic beverage that was growing stronger as he was speaking to him, bloodshot eyes, and slurred speech.

On cross examination, Deputy Sapp conceded that, from his perspective at the time, the defendant would not have been free to leave the roadside.

### *The Parties' Arguments and the Court's Ruling*

After the parties rested, the defense argued, among other things, that suppression was appropriate because the defendant was not given his *Miranda* warnings when the questioning switched from a crash investigation to a DUI investigation. The defense also argued that the *Miranda* warnings were required because the defendant was in custody during his interaction with Deputy Sapp.

The State contended that the accident report privilege was inapplicable to Deputy Sapp's questioning directed at the DUI and that *Miranda* did not apply because the defendant was not in custody.

The trial court granted the motion to suppress statements made to Deputy Sapp, stating in part:

> **[T]his is a crash case. The magic words were not said**. The signs of -- And questions that were asked with the credible answers of Officer (sic) Sapp were for the purpose to determine . . . whether he could do the exercises. And I believe Officer Sapp when he says that.
>
> However, **it's very clear from experience, that that's not the only reason he asked those questions**, otherwise they wouldn't be used in every trial as a sign of impairment. It was

3

even discussed today with one of his answers that clearly he had a sign of impairment based on his answers to the questions, because he was slurring his words.

***Miranda* was not read**; it's very clear based on the evidence.

**It's also very clear based on the evidence that the defendant felt interrogated and that he asked for an attorney. *Miranda* was not read after that either**.

So, all the statements that were made after *Miranda*, statements only, which refer to the answers to the questions that he asked, would be stricken. And I will grant the motion.

(Emphasis supplied).

The trial court later entered an order denying the motion without any specific findings of fact or conclusions of law.

### *Standard of Review*

"The standard of review applicable to a motion to suppress evidence requires that this [c]ourt defer to the trial court's factual findings but review legal conclusions *de novo*." *Pantin v. State*, 872 So. 2d 1000, 1002 (Fla. 4th DCA 2004) (quoting *Backus v. State*, 864 So. 2d 1158, 1159 (Fla. 4th DCA 2003)).

However, as the State points out, the defendant's entire interaction with Deputy Sapp was captured on a bodycam video and played at the hearing. We have reviewed the video. To evaluate it, we are in the same position as the trial court. *See McCloud v. State*, 208 So. 3d 668, 676 (Fla. 2016) (recognizing when a videotape or audio recording is part of the record on appeal, the trial court is in no better position to evaluate that evidence than the appellate court).

To the extent that the trial court's factual findings are based on the bodycam video recording, we apply a less deferential standard of review. *Parker v. State*, 873 So. 2d 270, 279 (Fla. 2004); *Black v. State*, 59 So. 3d 340, 344 (Fla. 4th DCA 2011).

### *The Accident Report Privilege Did Not Apply to the Defendant's Statements*

From the arguments made in the trial court, we understand the trial court's reference to the "magic words" as referring to the failure of Deputy Sapp to tell the defendant that he was "switching hats"—that the focus of the investigation was changing from an accident investigation to a criminal DUI inquiry.

Here, Deputy Sapp was never involved in the accident investigation. By telling the defendant that he was there to conduct a criminal DUI investigation, he adequately informed the defendant that the roadside encounter had moved to a new phase. It was not necessary for him to say he was "switching hats" because he never wore the hat of an accident investigator.

The defendant relies on the accident report privilege set forth in section 316.066(4), Florida Statutes (2020), which provides in pertinent part:

> (4) Except as specified in this subsection, each crash report made by a person involved in a crash and any statement made by such person to a law enforcement officer for the purpose of completing a crash report required by this section shall be without prejudice to the individual so reporting. Such report or statement may not be used as evidence in any trial, civil or criminal. However, subject to the applicable rules of evidence, a law enforcement officer at a criminal trial may testify as to any statement made to the officer by the person involved in the crash if that person's privilege against self-incrimination is not violated. . . .

"The accident report privilege serves to exclude from evidence statements made by a driver involved in an accident to a police officer for the purpose of creating a crash report for that accident." *Stewart v. Draleaus*, 226 So. 3d 990, 994 (Fla. 4th DCA 2017).

"Once the accident investigation ends and the criminal investigation begins, the accident report privilege is not applicable." *State v. Marshall*, 695 So. 2d 719, 721 (Fla. 3d DCA 1996), *decision approved*, 695 So. 2d 686 (Fla. 1997). In cases where the same officer conducts both the accident investigation and the criminal DUI investigation, the officer typically indicates that he or she is "changing hats" and that a criminal investigation has begun. *See, e.g., State v. Norstrom*, 613 So. 2d 437, 439 (Fla. 1993) (officer "acknowledged that she made the 'changing hats' remark as a way to signify to [Norstrom] that she was going from the

accident portion of the investigation into the criminal portion of the investigation").

In *State v. Bender,* 48 Fla. L. Weekly D102 (Fla. 4th DCA Jan. 4, 2023), we recently recognized that an officer's announcement that a criminal DUI investigation was underway sufficiently notified a defendant that the investigation had moved on from the accident stage. *Id.* at *3. *Bender* also recognized that *Miranda* warnings were not essential in this situation to signal the shift to a criminal investigation. *Id.*

Here, Deputy Sapp was never involved in the accident investigation conducted by other deputies. After obtaining basic identity information, he informed the defendant that he was conducting a criminal DUI investigation. Deputy Sapp never questioned the defendant about the accident. When the defendant started to talk about the crash, Deputy Sapp reminded him that the crash was a separate thing, and that the defendant was not required to answer any of his questions.

We hold that Deputy Sapp's announcement that he was conducting a criminal DUI investigation adequately advised the defendant that a criminal investigation had commenced.

### *Deputy Sapp Was Not Required to Immediately Advise the Defendant of His Miranda Rights When Deputy Sapp Began to Conduct the DUI Investigation*

We agree with the State that that the trial court erred in suppressing the defendant's statements during the DUI criminal investigation because the defendant was not "in custody" at the time, so Deputy Sapp was not required to read *Miranda* warnings when he began the investigation.

*Bender* compels the conclusion that Deputy Sapp was not required to give *Miranda* warnings at the commencement of his DUI investigation. 48 Fla. L. Weekly D102, at *3.

In *Bender,* an officer responded to a crash involving Ms. Bender. *Id.* at *1. She cooperated with the officer throughout the crash investigation, but the officer never told her she had to respond to questioning. *Id.* As the officer questioned Bender about the crash, the officer noticed that "[her] eyes were red and glossy. [She] spoke with a slow pace," and "was slow to recall." *Id.* The officer then turned on the police car's dash cam video and asked Bender to stand in front of the car. *Id.* "[She] was not restrained, nor was she free to leave. But the officer did not tell her that she was not free to leave." *Id.*

6

At that point, the officer explained to Bender that the crash investigation was complete and that a DUI investigation had begun. Bender acknowledged that she understood. *Id.* Thereafter, Bender made statements to the officer regarding her alcohol consumption that night. *Id.*

After the officer notified her of the factors that led the officer to open the DUI investigation, Bender "agreed to participate in field sobriety exercises." *Id.* The officer explained "that for both of their safety, the officer would transport her to a nearby parking lot" to conduct the exercises. *Id.* "The officer never told Bender that she had to get in the car, nor did the officer physically escort her to the car." *Id.* "While in the officer's car on the way to the parking lot, Bender stated 'Oh, God. I'm so stupid. I'm so stupid.'" *Id.* at *2.

"After conducting the field sobriety exercises, the officer arrested Bender." *Id.* "The officer did not read Bender her *Miranda* rights." *Id.*

Bender moved to suppress her statements to the officer in part because the officer had not advised her of her *Miranda* rights after the officer had concluded the crash investigation. *Id.* The trial court granted the motion, in part holding that the officer was required to advise Bender of her *Miranda* warnings "as soon as the crash investigation turned into a criminal investigation." *Id.*

On the State's appeal, we rejected Bender's argument that the officer had a duty to read Bender her *Miranda* rights as soon as the crash investigation ended, disagreeing that "such a bright line rule applies." *Id.* at *3.

Because the officer in *Bender* "had announced the criminal DUI investigation was underway when [the defendant] made the statements at issue," we concluded that "this was no longer a crash investigation required by section 316.066 and was an investigation to which 'the usual rules and precepts associated with *Miranda* seem to apply.'" *Id.* (quoting *Vedner v. State*, 849 So. 2d 1207, 1212 (Fla. 5th DCA 2003)). Observing that the officer "never told Bender she had to respond to questioning," we held that "the officer's failure to immediately advise [the defendant] of her *Miranda* rights when the officer announced a DUI investigation was commencing does not render [the defendant]'s later statements per se inadmissible. Instead, we must focus on whether [the defendant]'s Fifth Amendment Rights were violated." *Id.* (internal quotation marks and citation omitted).

7

Here, unlike the situation in *Bender*, Deputy Sapp was not at all involved in the crash investigation. Nothing in the record indicates that the defendant was told that he was required to respond to law enforcement's questions. Deputy Sapp informed the defendant that he was conducting a DUI investigation before the challenged statements were made. He reminded the defendant multiple times that he did not have to answer any questions. Deputy Sapp's questioning was therefore not "a crash investigation required by section 316.066," but rather "an investigation to which 'the usual rules and precepts associated with *Miranda* seem to apply.'" *Id.*

Accordingly, Deputy Sapp's failure to immediately advise the defendant of his *Miranda* rights when he began to conduct a DUI investigation did not render the defendant's subsequent statements per se inadmissible.

### Deputy Sapp Was Not Required to Give Miranda Warnings Because the Defendant Was Not in Custody During the DUI Investigation

*Miranda* warnings were not required because the defendant was not "in custody" during the DUI investigation as that legal term of art has been elucidated by *Berkemer v. McCarty*, 468 U.S. 420 (1984), and its progeny.

At the outset, we note that except for the observation that the defendant "felt interrogated," the trial court did not analyze whether there had been a custodial arrest that would trigger the requirement to give *Miranda* warnings.

"In *Miranda*, the Supreme Court 'addressed the problem of how the privilege against compelled self-incrimination guaranteed by the Fifth Amendment could be protected from the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation.'" *Bender*, 48 Fla. L. Weekly D102 at *3 (quoting *Berkemer*, 468 U.S. at 428). "*Miranda* established four warnings that are required prior to questioning when a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (internal quotation marks omitted). "But the safeguards provided by *Miranda* apply only if an individual is in custody and subject to interrogation. Where either the custody or interrogation prong is absent, *Miranda* does not require warnings." *Id.* (internal quotation marks omitted).

"Persons temporarily detained" in a roadside stop "are not 'in custody' for purposes of *Miranda*." *State v. Whelan*, 728 So. 2d 807, 809 (Fla. 3d DCA 1999) (citing *Berkemer*, 468 U.S. at 440).

8

In *Berkemer,* the Supreme Court held that the roadside questioning of a motorist detained pursuant to a traffic stop did not constitute "custodial interrogation" for *Miranda* purposes. 468 U.S. at 442.

There, an officer stopped a defendant after seeing the defendant's car "weaving in and out of a lane" on the interstate. *Id.* at 423. When the defendant stepped out of the car, the officer noticed he had difficulty standing. *Id.* The officer concluded at that point that the defendant "would be charged with a traffic offense" and that his "freedom to leave the scene was terminated," but the defendant "was not told that he would be taken into custody." *Id.*

After the defendant performed a field sobriety test, the officer asked the defendant if he had used any intoxicants, to which the defendant responded that "he had consumed two beers and had smoked several joints of marijuana." *Id.* The officer then placed the defendant under arrest and transported him to jail. *Id.* The defendant was subsequently "charged with operating a motor vehicle while under the influence of alcohol and/or drugs." *Id.* at 424.

The Supreme Court concluded that the *Berkemer* defendant was not in custody for *Miranda* purposes and that nothing in the record indicated "that [the defendant] should have been given *Miranda* warnings at any point prior to the time [the officer] placed him under arrest." *Id.* at 441. The Court found that the defendant "failed to demonstrate that, at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated with a formal arrest," stating:

> From aught that appears in the stipulation of facts, a single police officer asked [the defendant] a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists. Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest.

*Id.* at 442 (footnote omitted). Although the arresting officer decided that the defendant would be taken into custody at the time the defendant wobbled out of his vehicle, the Court pointed out that such intent was never communicated to the defendant; the Court observed that such an "unarticulated plan has no bearing on the question [of] whether a suspect was 'in custody' at a particular time." *Id.*

One example of a Florida case applying *Berkemer* is *State v. Burns*, 661 So. 2d 842 (Fla. 5th DCA 1995). There, an officer stopped a defendant

after observing his erratic driving and detected signs of alcohol use once he exited the vehicle, prompting the officer to initiate roadside field sobriety tests. *Id.* at 843. The officer rejected the defendant's multiple requests to go to his nearby house. *Id.*

The Fifth District determined that the case involved a routine traffic stop where a defendant "was asked for his license and registration and to perform field sobriety tests. The stop was short (eleven minutes), occurred in a public area, only one officer was present, and the tests were simple." *Id.* at 844. The court held that the defendant was not in custody because although "his freedom of action was curtailed, as it is in any detention, [the defendant] did not bring forth any evidence that he was subjected to any restraints comparable to those found in a formal arrest." *Id.*

Similarly, in *Bender* we recently concluded that the defendant was "not subject to the restraints of a formal arrest" where the defendant was told the officer was conducting a DUI investigation and was transported in a patrol vehicle to a nearby parking lot to safely conduct field sobriety exercises; we pointed out that the officer neither ordered the *Bender* defendant to get in the car nor physically assisted her to it. 48 Fla. L. Weekly D102 at *4.

Like the defendants in *Berkemer*, *Burns*, and *Bender*, the defendant here was not "in custody" for *Miranda* purposes when Deputy Sapp conducted his DUI investigation.

First, the defendant was never told that he was in custody or otherwise not free to leave. Similar to the officer's "unarticulated plan" in *Berkemer*, Deputy Sapp's testimony at the suppression hearing that, from his perspective, the defendant was not free to leave had no bearing on the question of whether the defendant was "in custody" because this was never communicated to the defendant. *See Berkemer*, 468 U.S. at 421–22.

Second, the defendant was not subject to the restraints of a formal arrest prior to performing the roadside tests. Deputy Sapp spoke to the defendant at the front of his patrol car, on the side of the road, in an area open to the public, about thirty feet away from the crash scene. The deputy repeatedly told the defendant that he did not have to answer any questions.

The defendant contends that his freedom was curtailed "to a degree associated with actual arrest." We distinguish the cases defendant cites as involving more aggressive police conduct objectively indicative of a formal arrest. In *Noto v. State*, 42 So. 3d 814 (Fla. 4th DCA 2010), police

10

observed what they believed was a drug transaction in a restaurant parking lot. *Id.* at 816. They followed the defendant and stopped him for a traffic infraction. *Id.* After taking possession of the defendant's license and registration, the officer confronted the defendant "with evidence of guilt by accusing him of being involved in a drug transaction." *Id.* at 818. In this case, Deputy Sapp was investigating a DUI and he asked questions; he did not accuse the defendant of anything.

Similarly, in *State v. Evans,* 692 So. 2d 305, 307 (Fla. 4th DCA 1997), a DUI suspect was told not to leave the area and was transported by patrol car to a gas station, facts that are absent here, which are both the type of restraints "comparable to those associated with a formal arrest." *Berkemer,* 468 U. S. at 441.

Having the defendant walk a short distance to a safer location to perform field sobriety tests did not transform a traffic stop into a de facto arrest.

Deputy Sapp testified that he walked the defendant about thirty feet across the street because there was no place in the immediate area where he could safely conduct field sobriety exercises:

> There was no area in our . . . there's no place in our immediate area . . . on the side of 20 -- 207 12th Avenue where we could safely do exercises. There's no flat paved areas. The -- The only place . . . where there was a space where we could safely do exercises was on the left side of the road where I had him walk to.

Although the defendant's freedom may have been "curtailed, as it is in any detention," he "did not bring forth any evidence that he was subjected to any restraints comparable to those found in a formal arrest." *Burns,* 661 So. 2d at 844. The defendant was therefore not "in custody" for purposes of *Miranda.*

Unlike a post-arrest, post-*Miranda* warning situation, the defendant's indication that he did not want to answer certain questions without his lawyer did not trigger Deputy Sapp's obligation to cease questioning and seek further clarification. *See Almeida v. State,* 737 So. 2d 520, 522 (Fla. 1999) ("[I]f in the course of custodial interrogation a suspect makes an utterance that may be an attempt to invoke his or her rights, police may 'continue questioning for the sole purpose of clarifying the equivocal request.'") (quoting *Long v. State,* 517 So. 2d 664, 667 (Fla. 1987), *receded from by State v. Owen,* 696 So. 2d 715 (Fla. 1997)). The full panoply of

*Miranda* protections does not arise until a defendant is "subjected to treatment that renders him 'in custody.'" *Berkemer*, 468 U.S. at 440; *see Funesvalle v. State*, 133 So. 3d 1001, 1002 (Fla. 4th DCA 2013) (holding that defendant's statements made to a transporting officer did not amount to an invocation of a right to counsel because "custodial interrogation had not begun and was not sufficiently imminent"); *Caldwell v. State*, 41 So. 3d 188, 202–03 (Fla. 2010); *Hewitt v. State*, 920 So. 2d 802, 804 (Fla. 5th DCA 2006); *State v. Olave*, 948 So. 2d 995, 997 (Fla. 4th DCA 2007); *State v. Dykes*, 816 So. 2d 179, 180 (Fla. 1st DCA 2002).

For these reasons, we reverse the order suppressing the statements the defendant made to Deputy Sapp and remand to the trial court for further proceedings.

*Reversed and remanded.*

CONNER and FORST, JJ., concur.

*     *     *

**Not final until disposition of timely filed motion for rehearing.**