COMMONWEALTH vs. PATRICK M. BURKE.

Berkshire. October 7, 1992. - February 11, 1993.

Present: LIACOS, C.J., NOLAN, LYNCH, & GREANEY, JJ.

*Homicide. Practice, Criminal*, Assistance of counsel, Admissions and con-
fessions, Mistrial, Instructions to jury. *Evidence*, Cross-examination,
Consciousness of guilt. *Malice.*

At a first degree murder trial, various alleged deficiencies in the perform-
ance of the defendant's attorney, whether considered separately or to-
gether under the broad standard of review made applicable to a "capi-
tal" case by G. L. c. 278, § 33E, did not support the defendant's claims
of ineffective assistance of counsel. [256-264]
At a first degree murder trial, the judge's erroneous instruction to the jury
with respect to the concept of malice aforethought, when viewed in the
context of the entire charge, was not prejudicial to the defendant. [265-
266]
At a first degree murder trial, the judge did not err when he omitted the
words "cool reflection" from his otherwise accurate instruction to the
jury describing the concept of deliberate premeditation. [266-267]


INDICTMENT found and returned in the Superior Court De-
partment on September 12, 1988.

The case was tried before *George C. Keady, Jr.*, J., and a
motion for a new trial was considered by him.

*Timothy J. Shugrue*, Assistant District Attorney, for the
Commonwealth.

*John H. LaChance* for the defendant.

LIACOS, C.J. On May 26, 1989, a jury convicted the de-
fendant of murder in the first degree by reason of extreme
atrocity or cruelty and deliberate premeditation.[1] The trial
judge sentenced the defendant to life imprisonment. Follow-

---

[1]The jury also convicted the defendant of larceny of a motor vehicle.
This conviction was placed on file with the consent of the defendant.

ing the withdrawal of his trial counsel, the defendant filed a motion for a new trial in the Supreme Judicial Court. The motion was referred to a single justice in the county court who remanded the motion to the Superior Court, where the trial judge denied it without a hearing. The defendant now appeals from the denial of his motion for a new trial and from his conviction. We affirm.

We summarize the evidence which the Commonwealth presented to the jury.[2] At about 9 P.M. on August 30, 1988, the victim, Nancy Fallon, left the house which she shared with her male friend. Fallon had just argued with him. She drove to a bar in Pittsfield. At the bar, Fallon first spent some time speaking with a regular customer. She was then approached by the defendant and David Talbot, who was also charged with Fallon's murder.[3] The defendant and Talbot sat next to Fallon and engaged her in conversation. The bartender overheard the defendant tell Fallon that he liked her.[4]

Around 11:30 P.M., the defendant and Talbot told the bartender that they had no more money, whereupon the bartender bought them each a beer. At that time, Fallon was still sitting with the defendant and Talbot. At 11:45 P.M., the bartender gave the last call for drinks and proceeded to take orders. By the time the bartender reached the side of the bar where the victim had sat with the defendant and Talbot, all three were gone. The bartender did not know whether they had left together. Fallon was not seen alive again.

The next morning, the Pittsfield police department was notified by a private citizen that there were blood splatters and a tire iron stained with blood at a roadside rest area in Hancock. State troopers dispatched to the scene also found a bloody automobile floor mat and an open knife with blood on

---

[2] The defendant did not testify nor did he call any witnesses in defense.

[3] The defendant reports that Talbot was found guilty of murder in the second degree at a separate trial.

[4] The victim consumed approximately three or four beers in the course of the evening, while the defendant and Talbot had about four or five beers each.

its blade. The floor mat was later identified as being from Fallon's automobile. The knife was identical to one she owned.

On September 3, 1988, the Marlborough police located Fallon's automobile. Several stains in the automobile tested positive for blood. On September 5, 1988, using a specially-trained dog to search the vicinity of the rest area, police found Fallon's body partially buried on a hill. Fallon had been stabbed twenty times in the left breast by a knife matching the size of her pocket knife. She had received a blunt trauma to the side of her head. Her jaw was fractured, and some of her teeth broken as a result of blows to her mouth. She had suffered trauma to her upper chest area, caused by kicking or stomping. Blows had caused a one and one-half inch laceration to her right lung. Also, front and back ribs had been broken.[5]

On August 31, 1988, the day after Fallon's disappearance, the defendant and Talbot drove Fallon's automobile to Leominster, where they visited the defendant's girl friend, Jean Broughey. Broughey asked the defendant and Talbot how they obtained the automobile, and they advanced several different explanations, none of which made reference to the victim. Broughey also noticed that there were brown stains on the defendant's dungarees, and she inquired about them. The defendant replied that they were blood stains. He added that he had fought with someone while trying to steal an automobile on the previous night. Following this conversation, Broughey washed the defendant's dungarees.

The defendant, Talbot, and Broughey drank heavily throughout the morning. Around noon, they drove the victim's automobile to the defendant's parents' house. At his parents' house, the defendant burst out crying and said, "I can't take this." When Broughey asked the defendant why

---

[5]Expert medical testimony revealed also that the victim had been strangled. The medical examiner testified that the strangulation alone could have caused the victim's death. Likewise, either the blunt force injuries or the sharp force injuries which the victim suffered could alone have caused death.

he was upset, the defendant replied that he thought Broughey "did not love him." Broughey, however, testified that she and the defendant had had no disagreement that morning and that she had treated him "cordially" all along. Later, the defendant, Talbot, and Broughey went to visit friends in Marlborough. Again, the group used the victim's automobile. Along the way, Broughey noticed blood on the windshield. She inquired about the blood, whereupon Talbot moistened a sponge with vodka and cleaned the windshield. At their friends' house, the defendant and his companions continued to drink heavily.

Some time later, the defendant left their friends' house in the victim's automobile to visit a former girl friend. The defendant was next seen walking on the streets of Marlborough by a police officer who concluded that the defendant was intoxicated and should be placed in protective custody. Broughey went to pick up the defendant at the Marlborough police station. Later that day, Broughey and the defendant had an argument that evolved into a physical fight, and Broughey left the defendant.

The defendant wanted to use the victim's automobile again, but he could not remember where he had left it. The next day, September 1, 1988, the defendant called Broughey early in the morning. He told Broughey that he had "lost" the automobile in Marlborough. Broughey told him that she had left her purse in the automobile. The defendant replied that she should report her purse stolen.

On that same day, the defendant made an incriminating statement to Regina Strong, the fifteen year old daughter of Talbot's girl friend, Irene Hilliard. While conversing with the defendant in her mother's house, Strong inquired about the cuts on his hands. The defendant replied that he had killed a woman. The defendant said that he met the woman in a bar and wanted to "get laid." The defendant added that he threw a knife into the woods.

On September 3, 1988, when the Marlborough police department located the victim's automobile, they found

Broughey's purse inside the automobile and telephoned her.[6] Following her conversation with the police, Broughey spoke with the defendant. She asked him whether he had killed anyone, and he replied that "he didn't know."

Meanwhile, police began to search for the defendant and Talbot. On September 5, 1988, Ipswich police officers stopped an automobile on Route 1A. When the vehicle pulled over to the side of the road, the defendant and Talbot ran from it and fled. Police found Talbot hiding nearby. The defendant managed to escape but he was found in the early morning hours hiding in a barn in Hamilton. Both the defendant and Talbot were placed under arrest.

In this appeal, the defendant argues that his counsel provided him with constitutionally defective representation and that the judge erred in his instructions to the jury. We begin with our discussion of the ineffective assistance claims.

I. *Ineffective assistance of counsel claims.* Our inquiry with respect to such claims has traditionally focused on "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). However, in reviewing "capital" cases pursuant to G. L. c. 278, § 33E (1990 ed.), we apply a standard of review "even more favorable to the defendant." *Commonwealth* v. *MacKenzie*, *supra*. We consider "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v.

---

[6]Several spots in the automobile tested positive for blood matching the victim's blood type. There was one floor mat in the back identical to that found by the police in the rest area near the hill where the victim's body was found. Also, a latent palm print matching that of Talbot was found on the rear hatchback window.

*Wright*, 411 Mass. 678, 682 (1992). In other words, we review a defendant's claim "even if the alleged error on the part of trial counsel does not constitute conduct falling 'measurably below' that of 'an ordinary fallible lawyer.'" *Commonwealth* v. *MacKenzie, supra.*

With these principles in mind, we turn to the merits of the present appeal.

(a) *Cross-examination of the chemist with respect to blood on the defendant's dungarees.* The Commonwealth introduced the dungarees that the defendant wore on the morning after the victim's murder. Karolyn LeClaire, a chemist with the Department of Public Safety, testified that the stains on the defendant's dungarees tested positive for blood. This evidence was relevant to the issue of the defendant's guilt and was properly admitted. See *Commonwealth* v. *Wright, supra* at 683.

The defendant argues that his trial counsel should have done more to impeach LeClaire. The defendant asserts that counsel should have explored some alleged differences of opinion between LeClaire and the chemist who actually tested the defendant's dungarees, Robert Pino.[7] The defendant also argues that trial counsel should have rebutted LeClaire's testimony with chemical reports that showed that Burke's dungarees tested negative for blood. Finally, the defendant faults his counsel for not eliciting on cross-examination that substances other than blood may trigger positive results under the ortho-tolidine test which Pino used.

The record does not support the defendant's claims. Counsel had nothing to gain from exploring the differences between LeClaire's testimony and Pino's analysis. While LeClaire conceded that she could not characterize the blood as human, Pino wrote in his report that the blood was of human origin. Had counsel attempted to impeach LeClaire with Pino's conflicting opinion, he would have referred to evidence less favorable to his client than LeClaire's testimony.

---

[7]Pino was unavailable to testify on the day the Commonwealth introduced evidence of the blood on the defendant's dungarees.

Far from harming his client's defense, then, counsel's decision not to allude to Pino's report prevented the jury from hearing that a chemist with first-hand knowledge concluded that the blood on Burke's dungarees was of human origin.

Similarly, trial counsel's decision not to impeach LeClaire with test reports not introduced at trial was a reasonable tactical decision. These reports stated that the defendant's dungarees tested negative for blood but that blood may have been present in a quantity falling below the detection level of the test. Had counsel referred to this information in his cross-examination of LeClaire, he would have given the prosecution an incentive and opportunity to use Pino's report or testimony to rebut this argument.

The defendant's trial counsel did not mistakenly omit to impeach an expert witness with conflicting data. Rather, counsel chose to focus on LeClaire's concession that the blood on the defendant's dungarees may not have been of human origin. In light of the defendant's earlier admission to Broughey that the stains on his dungarees were blood stains, we cannot say that counsel's behavior was deficient under the standard applicable to a "capital" case. See *Commonwealth v. Laguer*, 410 Mass. 89, 91-93 (1991).

(b) *Admission of statements that the defendant made to private citizens.* The Commonwealth introduced evidence of incriminating statements that the defendant made to private citizens. The defendant now argues that he made these statements while intoxicated and that his lawyer should have attempted to have the statements excluded on the ground that they were not made voluntarily. The defendant further asserts that, at the very least, counsel should have requested jury instructions on this issue.

We have held that, when "the voluntariness of a defendant's statements to private citizens is an issue, the judge should conduct a voir dire to determine the voluntariness of the statements. If the judge determines that the statements are voluntary, in accordance with our 'humane practice,' the issue of voluntariness should be submitted to the jury for consideration." *Commonwealth v. Allen*, 395 Mass. 448, 456

(1985), citing *Commonwealth* v. *Harris*, 371 Mass. 462, 469-470 (1976).[8] A defendant may show that statements made to private citizens were attributable in large measure to intoxication and were not the product of "rational intellect or free will." *Commonwealth* v. *Allen, supra* at 455.

The procedure for determining whether a statement to a private citizen was made voluntarily is not required in a case that does not present an issue of voluntariness. *Commonwealth* v. *Allen, supra*. In the present case, the defendant has not shown that his counsel's decision not to make voluntariness an issue at trial was likely to have influenced the jury's conclusion. There was no evidence at trial that the defendant was intoxicated when he made the two statements that were most damaging to his case — his admission to Strong that he killed a woman, and his statement to Broughey that he "didn't know" whether he had killed someone.[9] See *Commonwealth* v. *Brady*, 380 Mass. 44, 56-57 (1980). The self-serving nature of the other statements which the defendant argues his trial counsel should have attempted to exclude — e.g., the statement that the defendant stained his dungarees with blood while attempting to steal an automobile — also belies the defendant's claim that they were not made voluntarily.

Likewise, the defendant has not shown that there is substantial likelihood of a miscarriage of justice as a result of the judge's failure to instruct the jury on the effect of intoxication on the voluntariness of a defendant's statements. A judge has no duty to instruct the jury on voluntariness "unless it is made a live issue at trial." *Commonwealth* v. *Tavares*, 385 Mass. 140, 150, cert. denied, 457 U.S. 1137

---

[8]The Commonwealth has the burden of proving voluntariness beyond a reasonable doubt both to the judge and to the jury. *Commonwealth* v. *Allen*, 395 Mass. 448, 456-457 (1985).

[9]Further, the defendant's counsel had a strategic motive not to make the voluntariness of the defendant's statement to Strong an issue. Counsel sought to show that the defendant never told Strong that he killed Fallon and that Strong concocted the story to exculpate her mother's boy friend, Talbot. Making voluntariness an issue would have undercut this position by impliedly admitting that such statements were made.

(1982), quoting *Commonwealth v. Alicea*, 376 Mass. 506, 523 (1978). As in *Tavares*, the defense in the present case did not focus on involuntariness. Rather, the defense sought to convince the jury that the defendant never made the most damaging statement that was introduced against him and sought to minimize the impact of the other statements. In these circumstances, the judge had no obligation to submit the issue of voluntariness to the jury. *Commonwealth v. Tavares, supra*.

(c) *Evidence of the defendant's consciousness of guilt.* The defendant argues that his trial counsel should have attempted to obtain the exclusion of evidence of his flight from the police on the day before he was apprehended. The defendant does not contest the general principle that flight of one accused of a crime is admissible as evidence of consciousness of guilt. See *Commonwealth v. Toney*, 385 Mass. 575, 584-585 (1982); *Commonwealth v. Geagan*, 339 Mass. 487, 512, cert. denied, 361 U.S. 895 (1959). The defendant, however, asserts that he and Talbot had broken into a house immediately before the police attempted to stop them. The defendant argues that, while his flight tends to indicate consciousness of guilt of this offense, it had little or no relevance to his consciousness of guilt of the murder of Nancy Fallon.

The evidence of the defendant's flight was properly before the jury. We have held that whether "a flight from the police shows consciousness of guilt of the offense on trial when the defendant is charged with another offense is a question of fact for the jury going to the weight of the evidence, rather than a question of law for the judge going to the admissibility of the evidence." *Commonwealth v. Booker*, 386 Mass. 466, 470 (1982), citing *Commonwealth v. Madeiros*, 255 Mass. 304, 314 (1926). See *Commonwealth v. Jackson*, 388 Mass. 98, 103 (1983). It is also well-established that evidence tending to show consciousness of guilt will not be rendered inadmissible simply because it may reveal to the jury that the defendant has committed another offense. *Booker, supra* at 471.

The defendant cites a Federal case for the proposition that an exception to this general rule of admissibility should be carved in cases where the defendant stands trial for an offense that occurred *before* the offense which prompted the defendant to flee. See *United States* v. *Myers*, 550 F.2d 1036 (5th Cir. 1977), aff'd after remand, 572 F.2d 506 (5th Cir.), cert. denied, 439 U.S. 847 (1978). In *Booker, supra*, we distinguished *Myers* on the ground that the defendant in *Booker* stood trial for the more recent of his crimes. Notwithstanding this dictum, we decline to adopt a rigid rule whereby the admissibility of evidence of flight revolves solely around the sequence of events in a particular case. While such a consideration affects the relevance of evidence and may prompt a judge to exclude it, the crucial inquiry pertains to the logical inference that a jury may draw from the consciousness of guilt evinced by the defendant's flight and the crime for which the defendant is charged. See *United States* v. *Myers, supra* at 1049. In the present case, the Commonwealth introduced other facts that heightened the degree of confidence with which a jury could link the defendant's flight with consciousness of guilt of the murder of the victim: the defendant told Broughey to report her purse stolen because it was found in the victim's automobile; the defendant gave several conflicting stories to explain his possession of the victim's automobile; the defendant burst out crying and said, "I can't take this," on the day after the victim's disappearance; also, Talbot wiped off blood on the windshield of the victim's automobile when the blood was called to his attention. The jury could have considered these facts in conjunction with the evidence of flight and concluded that such flight evinced consciousness of guilt of Fallon's murder.[10]

---

[10]We also disagree with the defendant that his trial counsel's decision to refrain from telling the jury that the defendant fled because he had just committed a crime other than the victim's murder constituted ineffective assistance of counsel. Counsel reasonably could rely solely on the judge's instructions with respect to why an innocent person may flee rather than to bring evidence of another crime to the jury's attention.

(d) *Prosecutor's allusion to the defendant's letter alleg-edly suggesting that Broughey be killed.* The prosecutor told the jury in her opening statement that, about two months before trial, the defendant wrote a letter to a friend sug-gesting that Broughey should be killed because her testimony would hurt the defendant's case. The judge later excluded this evidence, whereupon the defendant unsuccessfully moved for a mistrial.

There is nothing in the record to overcome the presump-tion that the prosecutor held a good faith belief that she would be able to prove the facts she mentioned in her open-ing statement. See *Commonwealth* v. *Fazio*, 375 Mass. 451, 454 (1978). In light of the judge's curative instructions, we do not believe that the judge abused his discretion in denying the defendant's motion for a mistrial. See *id.* at 457 n.1, cit-ing *Commonwealth* v. *Gouveia*, 371 Mass. 566, 572 (1976) ("Denial of a mistrial and reliance on curative instructions may be proper, in the judge's discretion, even in the case of clearly improper argument by a prosecutor"); *Common-wealth* v. *Barnett*, 371 Mass. 87, 96 (1976), cert. denied, 429 U.S. 1049 (1977) ("Whether to grant a mistrial is largely a discretionary matter").

We disagree with the defendant's claim that his lawyer's failure to prevent the prosecutor from alluding to Burke's let-ter in her opening statement amounted to constitutionally de-ficient representation. Prior to trial, counsel moved to exclude "any documents, letters or other things of a written nature, purportedly directed by the Defendant" to Jean Broughey. During trial, counsel promptly objected when the prosecutor alluded to the letter. When the judge excluded the letter, counsel moved for a mistrial. He also renewed his motion for a mistrial at the close of the case. On these facts, the defend-ant's argument that his trial counsel was ineffective is with-out merit.

(e) *Counsel's cross-examination of Regina Strong.* The defendant argues that his trial counsel should have im-peached Regina Strong with prior statements made by her to the grand jury and to the police, and that counsel's failure to

do so constituted ineffective assistance. The defendant points out that Strong had denied in the grand jury proceeding that the defendant ever told her that he killed a woman. Further, the defendant asserts that his counsel could have used Strong's statement to the police to argue that she did not report the defendant's admission until she perceived that her mother's boy friend (Talbot) could be indicted for Nancy Fallon's murder.

The record does not support the defendant's claims. Strong had stated in her grand jury testimony that she recently had been admitted to the "Northern Gentlemen," to which the defendant belonged. Strong also stated to the police that the "Northern Gentlemen" swears its members to secrecy and does not hesitate to kill persons who testify against its members. Had the defendant's counsel impeached Strong with her initial reluctance to report that the defendant admitted to her that he killed a woman, the prosecutor's redirect examination may have raised the issue of Strong's and the defendant's membership in the "Northern Gentlemen." While the prosecutor carefully had avoided referring to the "Northern Gentlemen" earlier, trial counsel's impeachment of Strong would have heightened greatly the likelihood that Strong would mention the "Northern Gentlemen" on redirect examination. Counsel's decision to focus on Strong's bias in favor of Talbot while preventing the jury from hearing about the "Northern Gentlemen" was not unreasonable. Such a tactical decision by counsel did not constitute ineffective assistance. See *Commonwealth* v. *Jackson*, 388 Mass. 98, 114 (1983).

(f) *The defendant's failure to testify in his own defense.* The defendant claims that his trial counsel did not inform him of his right to testify in his own defense. The record, however, belies this contention. On May 25, 1989, the third day of trial, counsel asked the judge for some time to weigh the decision whether to proceed with a defense or to rest. Later that day, counsel stated, "I have spoken with my client and I know what I'm going to do." Further, the defendant had dealt several times with the criminal justice system and

appeared knowledgeable of his rights. He made no protest pertaining to his counsel's statements. There is no showing of ineffectiveness of counsel with respect to this issue. We will not disturb the judge's denial of the defendant's motion for a new trial that was based in part on this argument. See *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981).

(g) *Trial counsel's over-all performance.* The defendant argues that, even if any particular trial mistake allegedly made by his counsel did not amount to constitutionally ineffective assistance, the over-all performance of trial counsel unmistakably indicates that the defendant's legal representation at trial was deficient. The Commonwealth presented strong evidence of the defendant's guilt. The victim was last seen alive with the defendant. The defendant drove the victim's automobile on the day after the murder. The defendant made incriminating statements. Given the weight of the evidence which the Commonwealth introduced against the defendant, trial counsel's tactic to attempt to shift blame to Talbot was a highly sensible choice. In sum, we believe that "the basic trouble from the defense standpoint was weaknesses in the facts rather than any inadequacy of counsel." *Commonwealth* v. *Mercado*, 383 Mass. 520, 528 (1981), quoting *Commonwealth* v. *Key*, 381 Mass. 19, 33 (1980). Thus, we reject the defendant's ineffective assistance of counsel claims.[11]

II. *Jury instructions.* The defendant argues that the judge gave erroneous instructions with respect to the definition of the terms "malice aforethought" and "deliberate premeditation," that he erroneously instructed the jury on the factors they should consider when deciding whether a murder has been committed with extreme atrocity or cruelty, and that he failed to instruct the jury that they should consider evidence

---

[11]We reject also the defendant's argument that the trial judge abused his discretion when he denied the defendant's motion for a new trial without holding an evidentiary hearing. "The choice of deciding the motion on the basis of affidavits or hearing oral testimony is left largely to the sound discretion of the judge." *Fogarty* v. *Commonwealth*, 406 Mass. 103, 110 (1989). See *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981).

of intoxication when deciding the issue of extreme cruelty or atrocity.

(a) *"Malice aforethought."* The judge defined malice aforethought as "the frame of mind which includes not only anger and hatred and revenge but also any other unlawful and unjustifiable motivation." The judge also told the jury that malice "is the intent to inflict injury without legal justification." Where death flows "from a purposeful, selfish, wrongful motivation," the judge added, "there's malice aforethought." Neither the defendant nor the Commonwealth objected to these instructions. We review the defendant's claim of error pursuant to our obligation to determine whether there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Sires*, 413 Mass. 292, 297 (1992).

Malice aforethought may be shown by "proof that the defendant, without justification or excuse, intended to kill the victim or to do the victim grievous bodily harm." *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987), citing *Commonwealth* v. *Puleio*, 394 Mass. 101, 108 (1985). Additionally, malice aforethought may be inferred if, in the circumstances known to the defendant, there was a "plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Grey, supra.* See *Commonwealth* v. *Huot*, 380 Mass. 403, 408 (1980). As the Commonwealth concedes, the judge's instructions on malice aforethought deviated from our definition of this concept and were erroneous.

The judge's error, however, did not create a substantial likelihood of a miscarriage of justice. At the very least, the erroneous charge which, in its totality, required an intent to kill was more favorable to the defendant than the complete three-pronged definition required by this court. See *Commonwealth* v. *Stewart*, 375 Mass. 380, 390 (1978). Additionally, the record shows that the evidence did not raise a substantial issue as to the second and third prongs of the definition of malice aforethought. Rather, the central issue at trial pertained to the identity of the perpetrator of the homi-

cide. Cf. *Commonwealth* v. *Moore*, 408 Mass. 117, 134-135 (1990) (judge committed no error in giving only general instructions with respect to intoxication where only live issue at trial was identity of murderer and effect of intoxication on defendant's state of mind was not raised). Viewed as a whole, the judge's instructions conveyed to the jury that they should find that the defendant intended to kill the victim before they could find him guilty of murder.[12] The judge's failure to explain that malice may be shown by proof that the defendant intended to cause grievous injury or to create a plain and strong likelihood of death did not, therefore, prejudice the defendant. Cf. *Commonwealth* v. *Sires*, *supra* at 297 (standing alone, judge's omission of two elements on which the jury may have found malice not harmful to defendant).[13]

(b) *Deliberate premeditation.* The judge defined deliberate premeditation as "a plan to murder after deliberation." The judge explained to the jury that they must find "[f]irst the deliberations and premeditation, then the decision to kill and lastly the killing in furtherance of that decision." The defendant argues that the judge's instructions were erroneous because the judge neglected to tell the jury that deliberate premeditation must be the product of "cool reflection." *Com-*

---

[12]The judge's use of the words "purposeful, selfish, wrongful motivation," combined with his reference to "the decision to kill" and to "the killing in furtherance of that decision" in his instructions on deliberate premeditation, also effectively required that the jury find that the defendant intended to kill the victim. Indeed, under proper instructions, the jury found that the defendant deliberately premeditated the victim's murder.

[13]We also disagree with the defendant's claim that, had the judge properly instructed the jury on the issue of malice, the jury could have found that the defendant's intoxication negated his specific intent to kill. Despite a limited showing of intoxication (bartender who last saw defendant prior to victim's murder testified that defendant had consumed four or five drafts of beer over the course of the evening and did not appear intoxicated), the judge instructed the jury to consider voluntary intoxication in determining the defendant's intent. See *Commonwealth* v. *Doucette*, 391 Mass. 443, 455 (1984). Further, there is nothing in the record to support the defendant's argument that proper instructions on malice would have allowed the jury to find that the murder occurred in the heat of passion.

*monwealth* v. *Stewart*, 398 Mass. 535, 540-541 (1986), quoting *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605 (1978). The defendant asserts that this alleged error exacerbated the prejudicial impact of the judge's erroneous instructions on malice.

We do not require that "any specific form of words be spoken" in a jury instruction, *Commonwealth* v. *Chasson*, 383 Mass. 183, 188 (1981). The judge did not err when he omitted the words "cool reflection" from his otherwise accurate description of the concept of deliberate premeditation. This concept refers to the mental process whereby the defendant resolves to commit an unlawful act. See *Commonwealth* v. *Stewart, supra* at 541, quoting *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605 (1978) ("where the purpose is resolved upon and the mind determined to do it before the blow is struck, then it is, within the meaning of the law, deliberately premeditated malice aforethought"). We have upheld the propriety of a judge's instructions stating that deliberate premeditation is the "the prior formation of a purpose to kill." See *Commonwealth* v. *Chasson, supra*. The judge's instructions in the present case did not capture the meaning of deliberate premeditation any less accurately than the judge did in *Chasson*.

(c) *Extreme atrocity or cruelty.* The defendant claims that the judge committed prejudicial errors in his instructions on the effect of intoxication on extreme atrocity or cruelty, and in his instructions on the factors that a jury should consider in determining extreme atrocity or cruelty.

The defendant has not shown that such errors, if found to exist, would create a substantial likelihood of a miscarriage of justice. The jury returned a separate verdict of guilty of murder in the first degree on the theory of deliberate premeditation. Our review of the record shows that this verdict "would have been substantially unsullied" by the alleged errors in the judge's instructions with respect to extreme atrocity or cruelty. *Commonwealth* v. *Glass*, 401 Mass. 799, 804 (1988). Therefore, we need not decide whether these instructions were erroneous.

III. *Review under G. L. c. 278, § 33E.* We have reviewed the facts and the law pursuant to our duty under § 33E. We conclude that the jury's verdict was a just one that need not be disturbed.[14]

*Judgment affirmed.*

---

[14]To the extent the defendant's claim for relief under § 33E is based on the conviction of Talbot of murder in the second degree, we have declined to accept such an argument as sufficient to warrant the exercise of our power to reduce the verdict of the jury. See *Commonwealth* v. *Todd*, 408 Mass. 724, 729-730 (1990).