COMMONWEALTH vs. KENNETH WHITE
(and three companion cases[1]).

Middlesex. November 8, 1995. - April 18, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Practice, Criminal,* Required finding, New trial, Assistance of counsel,
Capital case. *Homicide. Joint Enterprise. Felony-Murder Rule. Evidence,*
Joint enterprise, Hearsay. *Search and Seizure,* Automobile, Probable
cause, Exigent circumstances. *Constitutional Law,* Search and seizure,
Probable cause, Self-incrimination. *Probable Cause.*

Evidence at the trial of two defendants on indictments for first degree mur-
der and armed assault in a dwelling was sufficient to warrant a rational
trier of fact in finding the defendants guilty beyond a reasonable doubt.
[493-495]
Police officers were justified in relying on a broadcast radio message to stop
a motor vehicle the appearance of which matched in detail the descrip-
tion of a vehicle seen leaving the scene of a murder and, based on
observations the officers then made, there was probable cause for the
subsequent warrantless search of the automobile for weapons. [495-498]
At a murder trial, error, if any, in defense counsel's failure to introduce for
impeachment purposes a property receipt listing clothing, worn by the
defendant after his arraignment and three days after the alleged crime,
would not have played an important role in the jury's deliberations and
conclusions and did not constitute ineffective assistance of counsel as
would warrant the grant of a new trial. [498-499]
A police officer's request for and documentation of the telephone number
called during booking by a defendant in the exercise of his right under
G. L. c. 276, § 33A, to make a telephone call did not violate the
defendant's rights under the Fifth Amendment to the United States
Constitution and art. 12 of the Massachusetts Declaration of Rights,
and in a subsequent prosecution there was no error in the use of the
telephone number and listing to demonstrate a connection between the
defendant and his coventurers. [499-503]
No reason appeared on the record of the murder trial of two defendants for
this court to exercise its power under G. L. c. 278, § 33E, to reduce the
verdicts or to order new trials. [503]

INDICTMENTS found and returned in the Superior Court
Department on December 24, 1991.

[1]Two against Whittaker White and one against Kenneth White.

A pretrial motion to suppress was heard by *R. Malcolm Graham*, J.; the cases were tried before *Catherine A. White*, J.; and a motion for a new trial was considered by *Nolan*, J., in the Supreme Judicial Court for the county of Suffolk.

*Richard M. Passalacqua* for Whittaker White.

*Carlo A. Obligato*, Committee for Public Counsel Services, for Kenneth White.

*Marguerite T. Grant*, Assistant District Attorney (*Adrienne C. Lynch*, Assistant District Attorney, with her) for the Commonwealth.

LIACOS, C.J. On December 24, 1991, a Middlesex County grand jury returned indictments against two brothers, the defendants Kenneth and Whittaker White, charging them with murder in the first degree, see G. L. c. 265, § 1 (1994 ed.),[2] and armed assault in a dwelling, see G. L. c. 265, § 18A (1994 ed.).[3] Both defendants were tried jointly before the same jury, and were found guilty on the indictments. The Commonwealth tried the first degree murder charges on theories of joint venture felony-murder, joint venture murder with deliberate premeditation, and joint venture murder with extreme atrocity or cruelty.[4]

On appeal, the defendant Whittaker White (Whittaker) claims the judge erred in (1) denying his motion for required findings of not guilty, see Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979), and (2) denying his motion to suppress evidence resulting from a warrantless search of his automobile. The defendant Kenneth White (Kenneth) claims the judge erred

---

[2]General Laws c. 265, § 1 (1994 ed.), reads in relevant part: "Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree."

[3]General Laws c. 265, § 18A (1994 ed.), states: "Whoever, being armed with a dangerous weapon, enters a dwelling house and while therein assaults another with intent to commit a felony shall be punished by imprisonment in the state prison for life, or for a term of not less than ten years. No person imprisoned under this section shall be eligible for parole in less than five years."

[4]The jury found the defendants guilty of murder in the first degree on each of these theories. In their separate briefs, each defendant focuses essentially on the joint venture felony-murder theory; we shall do the same. No separate arguments are made on the armed assault in a dwelling convictions.

in (1) denying his motion for required findings of not guilty, and (2) admitting evidence of the telephone number he called pursuant to G. L. c. 276, § 33A (1994 ed.) (statutory right to make telephone call after arrival at police station). Further, both defendants request this court to exercise its power under G. L. c. 278, § 33E (1994 ed.), to reduce the sentences. Finally, Kenneth appeals from the denial by a single justice of this court on October 17, 1994, of his motion for a new trial.[5] We affirm the judgments and the order of the single justice.

We summarize the facts in the light most favorable to the Commonwealth. *Commonwealth* v. *Grant*, 418 Mass. 76, 77 (1994). *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). In the late afternoon of November 15, 1991, Michael Kalil arrived at 49 Clark Street in Malden. Daniel "DJ" Woodley, an occupant of the apartment, allegedly was an illicit drug and gun dealer. Kalil often visited Woodley's rented apartment to purchase drugs. As Kalil approached the second-floor landing, he encountered a six-foot tall black man wearing a three quarter-length green army fatigue jacket, dungarees, and "satiny-type black ninja-style hood with a little face opening," carrying a "submachine-style pistol." This man, alleged to be Whittaker, held the gun to Kalil's head, told Kalil to "be cool or [he'd] kill [him]," and forced him to continue up the stairs. On the third-floor landing he saw four more men. Each was armed and wore some sort of mask. One wore a translucent clown mask, black baseball cap and black jacket with an Oakland Raiders insignia.[6] Another wore a black, three-quarter length quilted jacket with a grey lining and carried a semi-automatic pistol, "like a [nine millimeter] or a Colt." This man was alleged to be Kenneth. As Whittaker led Kalil up the stairway, Kenneth put a gun to Kalil's head, and moved to Kalil's side opposite Whittaker. The remaining men stood behind Kalil. Kenneth told Kalil, "Knock on the door, and be quiet, and be cool or you're dead."

---

[5]The court allowed Kenneth's request to enter his appeal from the single justice's order with the appeals from his convictions.

[6]Philip Morris, Jr., was tried separately before a jury and found guilty of murder in the first degree and armed assault. On appeal, the convictions were reversed on grounds which lend little support to the claims of these defendants. See *Commonwealth* v. *Morris, ante* 254 (1996).

Inside the apartment there were four people. Woodley and the victim David Morley were in Morley's bedroom, closest to the front door.[7] Another roommate, Andre Hunter, was in the middle bedroom with his half-brother, Terry Thompson. Morley, on hearing Kalil's knock on the door, asked who it was. Kalil responded "Mike," whereupon Morley opened the door. The men rushed into the apartment, shoving Kalil out of the way. Morley rushed for or was pushed into his bedroom. Someone yelled "Freeze, police," and shots were fired. Morley was shot and later died from loss of blood resulting from multiple gunshot wounds. Woodley crawled under a bed, Thompson jumped into a closet, and Hunter crawled between his mattresses. Thompson and Hunter saw none of the intruders, and Woodley saw only a hand of one of the men. He described seeing a black hand, holding an Uzi, protruding from the sleeve of a green army fatigue jacket. The Commonwealth asserted at trial that this was the hand of Whittaker. Kalil saw the man in the green army jacket (Whittaker) and the man in the clown mask leave Morley's bedroom immediately after Morley was shot.

Herbert Smith was repairing an automobile outside 49 Clark Street when he heard gunshots at around 3:55 P.M. He saw four men walk single file toward him and enter two automobiles. One was a brown Nissan Stanza or Maxima with a Massachusetts license plate. The other was a light-brown, two-door Camaro hatchback, with a large "swirly" antenna on the hatch, a New York license plate containing the digits "F22" or "F25" on its face, a dent on the fender, and a piece of molding hanging from the driver's side door.

The information about the shooting, including the description of the suspects and the vehicles, was disseminated at the evening roll call to Boston police officers at approximately 5:30 P.M.[8] At approximately 6:50 P.M. that evening, Officers Raymond Ramirez and Santos Hernandez, while in an unmarked police cruiser, saw a brown Camaro fitting the de-

---

[7] The day prior to the invasion, Woodley and the victim had exchanged bedrooms. The Commonwealth suggested at trial, and the jury could have inferred, that Woodley was the intended target of the shooting, and that the shooting was the result of a drug-related dispute.

[8] Lieutenant Phillips of the Malden police notified the Boston anti-gang violence unit because the occupants of the apartment originally were from Boston and Woodley continued to operate his drug dealing operation in Boston.

scription of the automobile seen at the earlier home invasion. The vehicle's New York license plate number was F5B362. The officers followed the automobile for approximately one mile before stopping the Camaro and calling for backup assistance. The officers approached the automobile with flashlights, and observed a green army fatigue jacket behind the driver's seat and a black jacket behind the passenger's seat. These jackets matched the description of the clothing worn by the assailants given earlier to the police. Whittaker was driving the automobile, while Kenneth was in the front passenger seat watching a small, portable television. Ramirez instructed Whittaker to turn off the engine and took Whittaker's keys. When asked for identification, Whittaker produced a New York learner's permit, and Kenneth produced identification in the name "Lawrence White."[9] The officers ordered the defendants out of the vehicle, pat-frisked them, and searched the automobile. They retrieved the two jackets, a black ninja-style mask and address book, both located in the pocket of the green army jacket, and various other items. In a closed compartment over the rear quarter panel on the left side, Officer Hernandez located a gray gym bag containing two guns. One was a Cobra semi-automatic pistol with a detached but loaded clip and the other was a fully loaded Glock semi-automatic nine millimeter handgun. It was later determined that eight nine-millimeter casings and five projectiles recovered at the scene of the intrusion were fired from the Cobra. The Glock was not fired at the scene. No identifiable fingerprints were found on either of the guns or on the magazine cartridges. The defendants were arrested and taken to the police station.

Whittaker and Kenneth were booked at 8:15 P.M. Kenneth exercised his right to make a telephone call. See G. L. c. 276, § 33A. Pursuant to standard policy, Kenneth told the booking officer the number he wished to call and the officer dialed the number for Kenneth, noting the number on Kenneth's

---

[9]Lawrence White is the name of a deceased brother of Kenneth and Whittaker. Kenneth first revealed his true identity when confronted by police at the station. Whittaker testified that Kenneth had used the name "Lawrence White" for some time, to avoid paying "tremendous" parking fines.

booking sheet. The telephone number called was listed to the residence of Philip Morris.[10]

Whittaker waived his Miranda rights, see *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and gave the following account of his whereabouts earlier in the day. He, his brother, and his girl friend drove to Boston from New York. At some time between 3 and 3:30 P.M, they went to Boston City Hall to obtain a copy of a birth certificate of the child of Whittaker and his girl friend.[11] Whittaker and Kenneth intended to remain in their automobile while Whittaker's girl friend obtained the birth certificate, but they later left the area while Whittaker's girl friend was still inside. Whittaker testified that he and Kenneth then went to Philip Morris, Jr.'s, home, where Morris and Stanley Oblines[12] were present. Whittaker lent his automobile to them, telling them to return within one-half hour. He and Kenneth then fell asleep, and when Whittaker awoke between 3:30 and 4 P.M., Kenneth was watching cartoons. The two went to a pizza shop at approximately 5 P.M., ate pizza, and drank sodas. Oblines was present at Morris's house when Whittaker and Kenneth returned. Whittaker stated that he and Kenneth then left Morris's house after arguing about the delay in returning the automobile, and were on their way to pick up Whittaker's girl friend and return to New York when they were pulled over by police.

Kenneth's statement to police, given approximately one hour after the police had questioned Whittaker, differed significantly from that given by Whittaker. Kenneth stated, after receiving and waiving Miranda warnings, that the two arrived from New York the previous day, that he was staying at an apartment in Boston, that he did not know whose apartment it was, and that he did not talk to the occupants of the

---

[10]In addition, during the period between November 19 and December 6, 1991, while Whittaker was incarcerated awaiting trial, someone in his cell block made twelve collect telephone calls to Philip Morris, Jr.'s, telephone number. The calls ended when police executed a search warrant of Morris's home. Telephone records also indicate numerous calls from Morris's home to the same Brooklyn, New York, telephone number called by Whittaker during his booking procedure.

[11]Registrar records show that a birth certificate for Glorious Landrum-White was issued on November 15, 1991, between noon and 1:08 P.M.

[12]The record refers to this person as both Stanley "Oblinas" and "Oblines." For consistency, we adopt the spelling used by the parties in their briefs.

apartment nor did they talk to him. He stated that he had been up late the night before, slept until late in the afternoon, and watched cartoons when he awoke. His brother then returned to the apartment and they were on their way to New York when stopped by police.

On November 16, 1991, the day following Whittaker's arrest, Officer Daniel P. Linskey was in the lockup area talking to someone he had arrested on a matter unrelated to the home invasion. Whittaker interrupted the officer and asked what the penalty for possessing a machine gun in Massachusetts was. He then asked if "the white guy really [died]?" After clarifying that he meant "the guy in Malden" and being told that the victim did in fact die, Whittaker said, "Yeah, but he was killed by a shotgun not a machinegun." The officers had not told Whittaker how Morley died, nor that he was white. The prior evening, Whittaker had asked police "if you got more time for killing a white man."

1. *Sufficiency of the evidence.* Both defendants moved at the end of the Commonwealth's case for required findings of not guilty, asserting that insufficient evidence existed for a rational trier of fact to find the defendants guilty beyond a reasonable doubt of the crimes charged. See Mass. R. Crim. P. 25 (a) ("The judge on motion of a defendant or on his own motion shall enter a finding of not guilty of the offense charged in an indictment or complaint or any part thereof after the evidence on either side is closed if the evidence is insufficient as a matter of law to sustain a conviction on the charge"). The judge denied both motions. The denial of the defendants' motions was proper if the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to satisfy any rational trier of fact of each element of the crimes beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979).

Whittaker claims that the circumstantial nature of the evidence against him is insufficient to link him to the location of the crimes, an element essential for the Commonwealth to prove under the theory of joint venture felony-murder. The evidence linking Whittaker to the crimes, viewed in a light most favorable to the Commonwealth, shows the following. Two witnesses described the assailant. Kalil described the assailant as a black man between five feet, ten inches, and six-feet tall, weighing between 175 to 190 pounds, and wearing a

green army fatigue jacket, a black ninja-style mask, and dungarees. Lieutenant Phillips testified that Woodley described the assailant's hand, protruding from a green coat sleeve, as that of a black man. Kalil identified Whittaker's eye and nose area from a series of photographs as being "almost identical" to that of the gunman's. Whittaker was apprehended three hours after the shooting driving the brown Camaro automobile seen leaving the scene. In the automobile were clothing identified as that worn by one of the assailants and a Cobra semi-automatic pistol that was fired at the scene of the invasion. Whittaker admitted ownership of the jacket and ninja mask found behind the driver's seat of the automobile, and Kalil later identified the jacket, ninja mask, and a gun as those worn and used by the assailant. Whittaker carried an address book with the telephone numbers of various persons, including Philip Morris, Jr. Finally, Whittaker made a series of statements at the police station tending to incriminate him.

Circumstantial evidence may support a conviction if the circumstances, taken together, do not require the jury to resort to speculation or conjecture. "[I]f, upon all the evidence, the question of the guilt of the defendant is left to conjecture or surmise and has no solid foundation in established facts, a verdict of guilty cannot stand." *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965), quoting *Commonwealth* v. *O'Brien*, 305 Mass. 393, 401 (1940). Whittaker claims that an equally plausible hypothesis as to the events of November 15, 1991, is that he lent his car to Philip Morris, Jr., and Stanley Oblines, who, unbeknownst to Whittaker, perpetrated the crimes with several other assailants and returned Whittaker's automobile to him still containing the incriminating coats and guns. When the Commonwealth's evidence is entirely circumstantial, a case cannot be proved if the evidence equally supports two inconsistent propositions. *Commonwealth* v. *Salemme*, 395 Mass. 594, 601 (1985). *Commonwealth* v. *Fancy, supra. Commonwealth* v. *Croft*, 345 Mass. 143, 144 (1962). It is equally well established, however, that the Commonwealth need not "show that it was not in the power of any other person than the defendant to commit the crime." *Commonwealth* v. *Fancy, supra* at 200, quoting *Commonwealth* v. *Leach*, 156 Mass. 99, 101-102 (1892). This is not a case where the evidence shows two people had equal

opportunity to commit the crime. See *Commonwealth* v. *Salemme, supra* at 598, 602 (no joint venture claimed; insufficient evidence to conclude one or another of two suspects perpetrated killing where waiter left two men alone with the victim at restaurant table); *Berry* v. *Commonwealth*, 393 Mass. 793, 796 (1985) (insufficient evidence existed where defendant and victim's mother had equal opportunity to kill victim).

That Whittaker perpetrated the crimes and that Whittaker lent his automobile to another who perpetrated the crimes are not inconsistent propositions equally supported by the evidence. Whittaker's face, automobile, and clothing were identified by witnesses. Whittaker made incriminating statements at the police station. The jury were not left to surmise or to conjecture in inferring that Whittaker was the assailant in the green army fatigue jacket.

Admittedly, the Commonwealth's case against Kenneth is less strong, but, still, was sufficient to warrant the verdicts. Under a theory of joint venture felony-murder, the Commonwealth must prove beyond a reasonable doubt that Kenneth "was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Chipman*, 418 Mass. 262, 268 (1994), quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). The evidence linking him to the crimes, viewed in the light most favorable to the Commonwealth, shows the following. Kenneth was the passenger, some three hours after the crime, in the brown Camaro automobile seen leaving the scene of the home invasion. Behind his seat was a black, three-quarter length quilted jacket with a grey lining, of which he admitted ownership and which was identified as the jacket worn by one of the assailants. Also in the car were two semi-automatic weapons, one of which was fired at the scene by the assailant identified as Whittaker. Finally, Kenneth called the home of Philip Morris, Jr., an alleged joint venturer, during the booking procedures. The jury were warranted in finding beyond a reasonable doubt that Kenneth was the assailant in the black, three-quarter length jacket.

2. *The search of the automobile.* Whittaker claims that the judge erred in denying his motion to suppress certain evidence gained as a result of a warrantless search of the brown

Camaro. The search was proper and did not violate the defendant's rights under the Fourth Amendment to the United States Constitution or under art. 14 of the Massachusetts Declaration of Rights.[13]

A warrantless search of an automobile generally must be based on probable cause. *Carroll* v. *United States,* 267 U.S. 132, 162 (1925). Probable cause for an automobile stop exists if sufficient information exists to "warrant a man of reasonable caution in the belief" that an offense has been or is being committed. *Id.* See *Commonwealth* v. *Bakoian,* 412 Mass. 295, 302 (1992). A reasonable belief must be grounded in " 'specific, articulable facts and reasonable inferences therefrom' rather than on a 'hunch.' " *Commonwealth* v. *Lyons,* 409 Mass. 16, 19 (1990), quoting *Commonwealth* v. *Wren,* 391 Mass. 705, 707 (1984). See *Carroll* v. *United States, supra* at 161-162. Where probable cause is based on a radio message to police officers, the Commonwealth must demonstrate the reliability of the factual basis of the transmission. *Commonwealth* v. *Cheek,* 413 Mass. 492, 494-495 (1992), and cases cited. "[E]vidence must be adduced demonstrating that the police officer responsible for issuing the radio communication had reliable information that a crime had occurred and that the instrumentalities or evidence of that crime would be found in the vehicle described in the broadcast." *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 56 (1974).

The Commonwealth presented evidence at the suppression hearing that the broadcast was based on police interviews with witnesses at the scene of the home invasion. See *Commonwealth* v. *Bowden,* 379 Mass. 472, 477 (1980) (percipient witnesses regarded as reliable). The officers communicated the witnesses' descriptions to Lieutenant Phillips at the Malden police station, who then informed the Boston anti-gang violence unit. Officers on routine patrol in an unmarked automobile spotted a motor vehicle of the same color as that described only hours previously, with the same distinctive antenna and New York registration plate partially matching that described by the witness. At this point, they at least had

---

[13]Article 14 of the Declaration of Rights of the Massachusetts Constitution states in pertinent part: "Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions."

reasonable suspicion to stop the vehicle.[14] See *Commonwealth* v. *Antobenedetto, supra* at 58 (police justified in relying on police bulletin to stop automobile matching transmitted description of vehicle and occupants).

Whittaker argues that the descriptions, conveyed by witnesses to Malden officers, then to Lieutenant Phillips of the Malden police, then to Superintendent Faherty of the Boston police, and finally to the Boston officers in the field, was third or fourth-hand hearsay information, and therefore inherently unreliable. The Commonwealth met its burden of showing the reliability of the radio message. See *Antobenedetto, supra* at 57 (burden on Commonwealth to show warrantless search is constitutional under Fourth Amendment). Probable cause may be based on hearsay information. See *Draper* v. *United States*, 358 U.S. 307, 311-312 (1959) ("That emphasis, we think, goes much too far in confusing and disregarding the difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search"), and cases cited, *id.* at 312 n.4; *Commonwealth* v. *Ortiz*, 376 Mass. 349, 354 (1978) (probable cause need not be based on evidence that would be admissible at trial on the issue of guilt). In such a case, the government must show the hearsay information was credible. *Commonwealth* v. *Bowden, supra* at 476 (witness description to police coupled with subsequent independent verification by police observation of defendant sufficiently reliable to provide probable cause). The record clearly reflects the consistent and attentive transmission of descriptions provided by percipient witnesses, and the independent observations by the Boston police officers verifying that information. Superintendent Faherty of the Boston police telephoned Lieutenant Phillips of the Malden police when the Camaro was stopped and, with Phillips on the telephone line and the officers on the radio, verified the descriptions of the assailants. There can be no doubt that such thorough police work provided probable cause for the subsequent search of the automobile for weapons.

Whittaker next argues that, in addition to a lack of probable cause, no exigent circumstances existed justifying the

[14]Once the officers approached the automobile and observed the green and black jackets described by witnesses to the crime, they had probable cause to search the automobile.

warrantless search. The motion judge upheld the search under the "automobile exception" to the warrant requirement. There was no error. The rationale behind this exception is that a "car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." *Commonwealth* v. *Antobenedetto, supra* at 53, quoting *Chambers* v. *Maroney,* 399 U.S. 42, 51 (1970). See *Commonwealth* v. *Cast,* 407 Mass. 891, 904 (1990) ("the inherent mobility of automobiles creates an exigency that they, and the contraband there is probable cause to believe they contain, can quickly be moved away while a warrant is being sought"). This court has rejected the proposition that police must stand guard over an automobile stopped on a public way while a warrant is obtained. *Commonwealth* v. *Bakoian, supra* at 304, citing *Commonwealth* v. *A Juvenile (No. 2),* 411 Mass. 157, 165 (1991). *Commonwealth* v. *Ortiz, supra* at 357-358. The motion was properly denied.

3. *Denial of Kenneth's motion for a new trial.* Kenneth argued in his motion for a new trial before a single justice of this court that trial counsel's failure to introduce at trial a property receipt, detailing clothing worn by Kenneth other than the black jacket, constituted ineffective assistance of counsel. The property receipt would have shown that Kenneth was wearing black jeans, a black shirt, and a red sweater on November 18, 1991, after his arraignment. This evidence, Kenneth argues, should have been used at trial to impeach Kalil's identification of Kenneth. Kalil had described the assailant believed to be Kenneth as wearing, in addition to the black three-quarter length quilted jacket with grey lining, a red and black ski mask, khaki-colored slacks and either a black or navy blue sweatshirt. The single justice denied the motion. Kenneth appeals. See note 5, *supra.*

The well-settled standard we apply when determining whether a defendant received effective assistance of counsel is set forth in *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974): "[W]hat is required . . . is a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise

available, substantial ground of defence." In a capital case such as this, however, we apply a standard under G. L. c. 278, § 33E, that is "even more favorable to the defendant." *Commonwealth* v. *Burke,* 414 Mass. 252, 256 (1993), quoting *Commonwealth* v. *MacKenzie,* 413 Mass. 498, 517 (1992). A conviction cannot stand if there was error on the part of defense counsel, the prosecutor, or the judge, and if that error was likely to have influenced the jury's conclusion. *Commonwealth* v. *Leitzsey,* 421 Mass. 694, 695 (1996). *Commonwealth* v. *Plant,* 417 Mass. 704, 715 (1994). *Commonwealth* v. *Burke, supra* at 256-257. *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992).

We discern no such error by trial counsel. The property receipt reveals that Kenneth wore black jeans, a black shirt, and a red sweater on November 18, 1991, the date of his arraignment three days after the shooting and his arrest. The property receipt also shows that Kenneth had $100.44 in his possession on the day of arraignment, although his booking sheet shows he had only forty-four cents on the day of his arrest. Clearly the property receipt cannot be said to be such a reflection of the state of events on the day of the invasion that failure to introduce it resulted in a miscarriage of justice. Kenneth's counsel extensively cross-examined the booking officers and officers present at Kenneth's arrest regarding his clothing at the time. One officer testified that the defendant wore corduroy pants and no hat when arrested, while another testified that Kenneth was wearing a tweed hat. A third officer recalled the defendant wore "dark clothing." The failure to use the Middlesex County jail property receipt to impeach Kalil, "on a full and reasonable assessment of the trial record . . . [would not] have played an important role in the jury's deliberations and conclusions." *Commonwealth* v. *Tucceri,* 412 Mass. 401, 414 (1992). See *Commonwealth* v. *Simmons,* 417 Mass. 60, 73 (1994).

4. *Use of the telephone number.* Kenneth claims that use at trial of the telephone number he called during his booking violated his constitutional rights under the Fifth Amendment to the United States Constitution and art. 12 of the Mas-

sachusetts Declaration of Rights, and thus should have been suppressed.[15] There was no error.

The Commonwealth presented at trial, in an effort to show a connection between Kenneth and the remaining joint venturers, the telephone number called by Kenneth when exercising his statutory right to make a telephone call within one hour of being booked for a crime. See G. L. c. 276, § 33A. According to Officer Mario Lozano, Kenneth was "informed of his right to remain silent, to use a phone to call a lawyer or to have one provided for him." He then requested from Kenneth the number Kenneth wished to call and wrote the number on the booking sheet. Lozano noted that the call went through by marking the word "yes" in a separate box headed "Phone Used?" That number was listed to the home of Philip Morris, Jr.

The defense urges that recording the number Kenneth called unconstitutionally burdened his statutory rights under G. L. c. 276, § 33A. We have stated that information gained as a result of an intentional deprivation of a defendant's right to make a telephone call may be suppressed at trial. See *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 266 (1982); *Commonwealth* v. *Meehan*, 377 Mass. 552, 567 (1979), cert. dismissed, 445 U.S. 39 (1980); *Commonwealth* v. *Alicea*, 376 Mass. 506, 511 n.11 (1978); *Commonwealth* v. *Jones*, 362 Mass. 497, 503 (1972). The police informed Kenneth of his right to use the telephone, and did in fact allow Kenneth to make a call. There was no statutory violation.[16]

Article 12 provides in part that "[n]o subject shall be . . .

---

[15]No motion to suppress the evidence of this telephone call was made and this evidence was admitted without objection. Thus, we review this claim only to see if there was an error raising a substantial likelihood of a miscarriage of justice. G: L. c. 278, § 33E.

[16]We have not suppressed information gained during a defendant's exercise of his or her rights under G. L. c. 276, § 33A. In *Commonwealth* v. *Yacobian*, 393 Mass. 1005 (1984), the defendant sought dismissal of charges against him because, in allowing the defendant to make a telephone call pursuant to G. L. c. 276, § 33A, the officers directed the defendant to a phone that automatically recorded his conversation. We declined to rule on the record because there were no facts found indicating whether the officers acted intentionally, or whether any prejudice to the defendant resulted. *Id.* at 1006. Similarly, we have found that a defendant who chooses to make a phone call pursuant to G. L. c. 276, § 33A, within obvious earshot of police officers enjoys no expectation of privacy. *Commonwealth* v. *Garcia*, 409 Mass. 675, 686 (1991) (defendant knew troopers were within

compelled to accuse, or furnish evidence against himself."
Miranda warnings must be given before the police may engage
in "custodial interrogation." *Miranda* v. *Arizona,* 384 U.S.
436, 444 (1966). Some information gained at booking is
"exempt" from the rule of *Miranda* v. *Arizona, supra,* that
inculpatory information gained from a defendant who has not
been informed of his or her rights must be suppressed.
*Pennsylvania* v. *Muniz,* 496 U.S. 582, 601 (1990). *Commonwealth* v. *Woods,* 419 Mass. 366, 372-373 (1995). *Commonwealth* v. *Acosta,* 416 Mass. 279, 283 (1993). Such routine
booking questions include biographical data requested for
record keeping purposes and related to police administrative
concerns, such as the defendant's height, weight, address,
date of birth and current age. We have held that requesting a
defendant's employment status in a drug possession case did
not fall within the "routine booking question" exception to
Miranda outlined in *Pennsylvania* v. *Muniz, supra,* and stated
that where such information may prove incriminatory, police
must give Miranda warnings before asking questions regarding a person's employment. *Commonwealth* v. *Woods, supra*
at 372. See *Commonwealth* v. *Guerrero,* 32 Mass. App. Ct.
263, 268-269 (1992). We need not decide whether the
telephone number called by a defendant when exercising his
or her rights under G. L. c. 276, § 33A, constitutes
"biographical data necessary to complete booking or pretrial
services," *Pennsylvania* v. *Muniz, supra,* quoting *United States*
v. *Horton,* 873 F.2d 180, 181 n.2 (8th Cir. 1989), as we
conclude that the request for information was not the result
of "custodial interrogation," and thus did not fall within the
protection of *Miranda* v. *Arizona, supra,* or of art. 12.

The suppression of responses to booking questions, undeniably testimonial in nature, is not required unless obtained by
compulsion. *Commonwealth* v. *Woods, supra* at 373.[17] *Commonwealth* v. *Acosta, supra* at 283, citing *Opinion of the Justices,* 412 Mass. 1201, 1208 (1992). Custody alone is insufficient to trigger the protection of Miranda. Rather, a person

---

four or five feet and spoke in normal voice). *Commonwealth* v. *Signorine,*
404 Mass. 400, 409 (1989) (defendant made no request for privacy).

[17]*Commonwealth* v. *Woods,* 419 Mass. 366, 372 n.10 (1995), addresses
only Federal law. We noted the consistency of State case law and Federal
case law; for purposes of our discussion here, State case law and Federal
case law appear consistent.

must be subject to custodial interrogation. Interrogation implies "a measure of compulsion above and beyond that inherent in custody itself," and applies when a person is subject to "express questioning or its functional equivalent." *Rhode Island* v. *Innis*, 446 U.S. 291, 300-301 (1980). Thus, Miranda warnings are only implicated by words or actions on the part of the police that they should know are reasonably likely to elicit an incriminating response. *Id.* at 301. *Commonwealth* v. *Woods, supra* at 373 ("Unless they first give the arrestee Miranda warnings or obtain a waiver of those rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions"). In *Commonwealth* v. *Acosta, supra* at 284, we declined to decide whether use of evidence of the defendant's address, acquired during booking and used to show constructive possession of drugs at trial, was "compelled," where other, overwhelming evidence of guilt ensured that no substantial risk of a miscarriage of justice occurred. Although we cannot say here that the evidence of Kenneth's guilt is overwhelming, we are confident that police documentation of the telephone number called by Kenneth during booking was not a question designed to elicit an incriminatory response.

It is clear that Kenneth was in police custody when he gave to police the telephone number of Philip Morris, Jr. There is no evidence, however, that Kenneth's statement was compelled. The police could not have reasonably known that recording the number called by an arrestee at booking would lead to incriminating evidence. See *Rhode Island* v. *Innis, supra* at 301. Recording the number called may confirm the defendant was afforded his or her statutory right, and protect against unauthorized use of station telephones. There is no evidence of police tactics meant to undermine the free will of the defendant, such as a "reverse line-up" or other psychological ploys. *Id.* at 299.

The telephone number an arrestee wishes to call is not inherently incriminating, and thus an arrestee need not reveal any incriminating evidence when the police assist the arrestee in dialing the number. An arrestee may call any number he or she chooses, and need not call the telephone of one likely to be implicated in the crime. Indeed, were we to hold otherwise, we would undoubtedly foster a practice allowing defendants to thwart law enforcement by warning others

involved in a joint venture to destroy evidence or act to avoid police detection. Cf. *Commonwealth* v. *Jones,* 362 Mass. 497, 500, 503-504 (1972) (police wrongfully refused defendant access to telephone in violation of § 33A to prevent defendant from warning coventurers). That is not the policy of the statute, which prescribes access to a telephone for the purpose of "allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney." G. L. c. 276, § 33A.

5. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record, including various omissions Kenneth now claims deprived him of his right to effective assistance of counsel, and see no reason to exercise our power under G. L. c. 278, § 33E, in his behalf or on behalf of Whittaker, to alter the murder verdicts or order new trials.

*Judgments affirmed.*[18]

---

[18]Various motions were filed relating to the record on appeal and to the length of the briefs to be filed. The defendant Kenneth's motion to expand the brief beyond the length allowed (see Mass. R. A. P. 16, as amended, 409 Mass. 1602 [1991]) is allowed. Kenneth's motion to strike requires no ruling as it relates to an issue not relevant to our decision.